IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

VALVE CORPORATION,

      Plaintiff,

  v.

ZAIGER, LLC, and JOHN DOE CORPORATION,

      Defendants.

Case No.

**COMPLAINT**

Plaintiff Valve Corporation ("Valve"), by and through its attorneys of record, Blake Marks-Dias and Jeff Bone of Corr Cronin LLP, for its Complaint against Zaiger, LLC ("Zaiger") and John Doe Corporation (collectively "Defendants"; each a "Defendant"), alleges as follows:

## INTRODUCTION

1.    This case is the result of unscrupulous lawyers and their funding partner attempting to weaponize the terms of Valve's dispute resolution agreement with Steam users to line their own pockets. Zaiger, with financial backing from a John Doe corporate funder, the identity of whom will be confirmed through discovery, has abused the legal process and interfered with Valve's relationships with its customers.

## PARTIES

2.    Plaintiff Valve Corporation is a Washington corporation with a principal place of business in King County, Washington.

COMPLAINT- 1

3.      Defendant Zaiger, LLC is a New York limited liability company with a principal place of business in Stamford, Connecticut.

4.      Defendant John Doe Corporation, on information and belief, is a foreign corporation that does business in Washington.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to RCW 2.08.010.

6.      Venue and jurisdiction over Defendant are appropriate in this Court pursuant to RCW 4.12.025 and RCW 4.12.010.

7.      On information and belief, one or more of Zaiger's clients that are Valve's customers reside in Washington State.

8.      Defendants' advertisements (which are described in more detail below) have been directed at and reached consumers in Washington State.

9.      Valve is a Washington corporation and has been harmed in Washington due to Defendants' actions.

## FACTUAL ALLEGATIONS

**A. Valve, Steam, and how Valve and Steam Users Resolve Their Disputes**

10.      Among other things, Valve operates Steam, an online service through which video game makers can sell and distribute their games to Steam users, who can purchase, download, and play those games through Steam.

11.      When any individual creates a Steam account to become a Steam user, they must agree to the Steam Subscriber Agreement, also referred to as the "SSA." The current version of the SSA is available online at https://store.steampowered.com/subscriber_agreement/.

12.      If a Steam user has some sort of issue related to Steam, that user will typically reach out to Steam customer support.  Most Steam user issues are resolved quickly using this pathway. *See* https://store.steampowered.com/stats/support/.

COMPLAINT- 2

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

13.     There are times when a Steam user can't get their particular issue resolved through Steam customer support, but those times are rare.

14.     In those instances, the Steam Subscriber Agreement lays out a dispute resolution process.

15.     The first step of that process is for the user to reach out and tell Valve: (i) what their specific issue is, and (ii) what they would like Valve to do to address that issue.  **Exhibit A** at § 11.B.

16.     Upon receiving this notice, Valve takes another look at that Steam user's account and is often able to resolve the issue and notify the Steam user of that resolution through Steam support.

17.     If Valve cannot immediately resolve the issue for the Steam user, the SSA describes what happens next:  Valve and the Steam user "make reasonable, good faith efforts to informally resolve" their dispute.  **Exhibit A** at § 11.B.

18.     This typically means that someone from Valve will reach out to the Steam user to gather more information and discuss potential resolutions for that user's issue.  When possible, this is done via teleconference, so that Valve has a chance to fully understand the particular Steam user's concern and work with that user towards resolving their concern.

19.     Valve has been able to successfully resolve Steam users' concerns using this informal dispute resolution process.

20.     If Steam support and the informal dispute resolution fail to resolve a particular Steam user's concern, that user may continue to pursue their concern by commencing individual, binding arbitration.  **Exhibit A** at § 11.  Such instances are exceedingly rare.

21.     To make sure arbitration is available to all Steam users regardless of their financial situation, Valve promises to pay the arbitration filing fees and costs for non-frivolous, non-harassing claims seeking up to ten thousand dollars.  **Exhibit A** at § 11.C.

COMPLAINT- 3

22.     Similarly, Valve promises not to seek repayment of its attorney's fees unless a particular Steam user brings a claim that is frivolous or for the purposes of harassment. **Exhibit A** at § 11.C.

23.     Standard consumer arbitration clauses do not provide for informal dispute resolution like the SSA.  *See* https://www.adr.org/Clauses.  Similarly, under standard arbitration clauses, the company involved does not agree to pay the arbitration fees or costs for the impacted consumer.  *Id.*

24.     In the five years before Zaiger began threatening Valve, 2017 to 2022, there were only two instances where Valve and a Steam user could not resolve that user's issue before proceeding to arbitration.  Both of those arbitrations were resolved in Valve's favor, and Valve paid all of the arbitrator fees and costs for both Valve and the impacted Steam user.

**B.  Defendants' Plan to Take Advantage of Steam Users and Extort Valve for Their Own Benefit**

25.     Defendants are a law firm, Zaiger, and its litigation funder, John Doe Corporation.

26.     Zaiger hatched a scheme to work with its litigation funder to "weaponize[]" the agreement between Valve and Steam users.  **Exhibit B** at 3.

27.     Zaiger targeted Valve and Steam users for its scheme precisely because the arbitration clause in the SSA is "favorable" to Steam users in that Valve agrees to pay the fees and costs associated with arbitration.  **Exhibit B** at 6, 7.

28.     As explained in a presentation that Zaiger presented to a potential litigation funder, Black Diamond Capital Management, [1] seeking funding for its scheme (the "Funding Presentation"), "[m]ost arbitration providers . . . charge a minimum of approximately $3,000 a case."  **Exhibit B** at 2.

29.     Thus, Zaiger explained, "[a]ggregating claims makes [the] entrance fee to just defend prohibitively expensive."  **Exhibit B** at 3.

---

[1] It appears that Black Diamond is Zaiger's actual funder; this Complaint will be amended once early discovery yields confirmation.

COMPLAINT- 4

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

30.    The Funding Presentation lays out Zaiger's plan to recruit 75,000 clients and threaten Valve with arbitration on behalf of those clients, thus exposing Valve to potentially millions of dollars of arbitration fees alone: 75,000 potential arbitrations times $3,000 in fees per arbitration is ***two hundred and twenty-five million dollars***.  **Exhibit B** at 3.

31.    Zaiger went on to explain its extortive plan to "offer a settlement slightly less than the [arbitration] charge—$2,900 per claim or so—attempting to induce a quick resolution." **Exhibit B** at 3.

32.    The Funding Presentation details the "Lifecycle of Investment" for Black Diamond:



# Lifecycle of Investment

- <u>Stage 1</u> **- Infrastructure:** $500,000 for software development, advertising and agreement templates, ethics opinions, hardware, marketing and survey consultants, and claim identification.

- <u>Stage 2</u> **- Client Recruitment:** $2 to $150 advertising cost per client to recruit. Estimated spend of $3.75 million to recruit 75,000 clients at $50 an acquisition.

- <u>Stage 3</u> **- Filing Cases:** Filing cost of $25,000 plus $50.02 a case, for an estimated filing cost of $3,776,500. (Never expended if an early settlement can be reached.)

- <u>Stage 4</u> **- Active Arbitration:** Zaiger LLC litigates the first 20 cases, developing templates and models for use on additional cases. $12,000 a case after that to hire contract attorneys managed by Zaiger LLC to litigate disputes using templates and strategies. Most completed arbitrations seen to-date is 160, so total cost likely less than $1.7 million

**Exhibit B** at 5.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

33.     Notably missing from the Funding Presentation is any mention of Steam users' concerns or interests.

34.     As can be seen in the Lifecycle of Investment slide above, there is no money set aside to evaluate whether any Steam user actually has a valid dispute with Valve.  That lifecycle instead focuses on building technical infrastructure, gathering clients, and then filing cases. There is no space in that lifecycle for investigating the legal issues involved or evaluating the facts of any particular Steam user's situation.

35.     Indeed, the Funding Presentation specifically lays out that Zaiger would do **no** work to develop its clients' claims, instead using a "passive" approach to "copycat existing legal theories with [a] better advertising approach."  **Exhibit B** at 6.

36.     This lack of care about Steam users, or the scope of their potential claims against Valve, is borne out by Zaiger's subsequent actions.

37.     Zaiger targeted Valve not only because of the "favorable" dispute resolution terms in the SSA, but also because Zaiger could "copycat" a legal theory developed by another law firm in another lawsuit that had already been sent to arbitration.  *See Wolfire Games, LLC v. Valve Corp.*, 2021 WL 4952220, at *3 (W.D. Wash. Oct. 25, 2021) (slip op.).

38.     As laid out in the Funding Presentation, Zaiger used social media and internet advertisements to lure Steam users to their website, www.steamclaims.com.

39.     Once on that site, Zaiger asked those users for a bare minimum of information, never once asking or providing space for the user to input any factual details about their individual issue with Valve.

COMPLAINT- 6

40.     In particular, instead of even attempting to gather information about what any Steam user had actually spent on Steam (to understand their potential claim and damages), Zaiger instead merely asked those users to select, from various preset options, how much money they wanted to recover from Valve:

**Exhibit C** at 4.

What is the minimum amount you would be willing to accept to settle your antitrust claim? *

⦿ I want my attorneys to get me the highest settlement they believe is reasonably possible

◯ $2,700

◯ $900

◯ The total amount I've spent on Steam

◯ I want to be contacted directly with any settlement offers Valve makes

◯ Other

41.     Notably, Zaiger does not ask Steam users to explain how the amount they wished to accept was tied to their spending on Steam, and ***the first option presented to them does not even contain a specific amount***.  **Exhibit C** at 4.

42.     Zaiger's failure to meaningfully evaluate its clients' claims is further reflected in a list of clients that Zaiger sent to Valve.  Valve could not tie many of the clients listed to actual Steam accounts; for those clients Valve *could* tie to Steam accounts, many had never made a purchase on Steam and thus could have no claim against Valve.

43.     Relatedly, the client list that Defendant sent to Valve was lacking in identification aspects that would be required for Valve to engage in arbitration.  The list gave only names, not Steam user IDs, email addresses, or client countries of residence.  Valve therefore could not verify that the purported clients were even Steam users covered by the Steam Subscriber Agreement.

COMPLAINT- 7

44.     Zaiger's explicit and intentional failure to meaningfully evaluate the legal merits or the factual underpinnings of its clients' claims is a breach of the ethics rules that all lawyers operate under, which require that lawyers "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."  American Bar Association Rules of Professional Conduct ("RPC") 3.1.

45.     Instead of focusing on the merits of their clients' claims, or their clients' interests, Zaiger and its funder are focused solely on their potential monetary recovery and return on investment.

46.     Indeed, the Funding Presentation enticed the potential funder to participate in and fund Zaiger's scheme by promising an expected return on investment of ***almost two thousand percent***.  **Exhibit B** at 9.

47.     Zaiger itself would also come out ahead in any recovery, keeping 40 percent of any amount recovered from Valve, plus reimbursement for any upfront fees and costs, and leaving whatever remained (if anything) for their Steam user clients to split.  **Exhibit D** at 1.

**C. Zaiger's Efforts to Thwart Valve and Steam Users' Informal Dispute Resolution Efforts**

48.     Knowing that the informal dispute resolution procedure agreed to by Valve and Steam users in the Steam Subscriber Agreement would likely short-circuit its plans to enrich itself and its funder, Zaiger did its best to thwart that process.

COMPLAINT- 8

49.     In fact, Zaiger promised Steam users that signed up as clients that they would not have to be involved with any informal dispute resolution with Valve, promising that after users sign up, Zaiger will "handle the rest":

## HOW IT WORKS

| YOU COMPLETE THE FORM | YOU SIGN THE AGREEMENT | WE HANDLE THE REST |
|---|---|---|
| It takes two minutes. | If you are eligible, Zaiger LLC will send you an agreement so we can represent you. It can be digitally signed in one minute on your phone or computer. | We will only contact you if we or the arbitrator needs additional information. Every case is different, but many consumers get compensation offers without doing anything beyond completing the initial form. |

*See* https://www.steamclaims.com/

50.     That promised lack of client participation is reflected in Zaiger's engagement letter with its clients.  That letter lists out the "Client's Duties"—the things a "client" must do in order for Zaiger to continue to represent them.  **Exhibit D** at § 4.  Those duties do not include engaging with Valve in the required informal dispute resolution process.  *Id.*

51.     Consistent with its promises to its Steam user clients, Zaiger refused, over and over, to allow Valve and its Steam user clients to engage in the informal dispute resolution process called for by the SSA—thus causing Zaiger's Steam user clients to breach that agreement through no fault of their own.

52.     The same ethics rules that Zaiger flouts by not investigating its clients' claims prevent Valve from reaching out directly to Steam users to understand their concerns or engage in the SSA's informal dispute resolution process.  RPC 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.").

COMPLAINT- 9

53.     Though Valve needed no reminding of its ethical duties, Zaiger went out of its way to make sure Valve would not affirmatively reach out its clients:

> All communications with respect to these claims should be directed to me (jzaiger@zaigerllc.com) and to John Roberti (jroberti@cohengresser.com).  Please do not contact or communicate with our clients in any way.  We look forward to hearing from you promptly.

**Exhibit E** at 2.

54.     The engagement letter also states that Zaiger "will not bother" its clients with various types of settlement offers.  **Exhibit D** at § 3.

55.     Zaiger seems particularly concerned with informing its clients of settlement offers that are for gift cards or other non-cash compensation, as that would complicate Zaiger's efforts to line its own coffers.  **Exhibit D** at § 3.  Indeed, the engagement letter states that if one of Zaiger's clients accepts a non-cash settlement offer, that client "would be responsible for paying Zaiger LLC on a per hour basis . . . rounded up to the nearest hour."  *Id.*

56.     This behavior again raises ethical concerns:  Zaiger is essentially trying to contract away its ethical duty to keep its clients informed.  RPC 1.4 ("A lawyer shall . . . keep the client reasonably informed. . . .").

57.     In short, Zaiger had and has no intention of allowing its clients to participate in the SSA's informal dispute resolution process, because doing so would frustrate its own efforts to maximize its, and its funder's, return of investment.

**D. Zaiger's Efforts to Engage Steam Users in Prohibited Collective Arbitration**

58.     Each Steam user is an individual.  The dispute resolution process that Valve and Steam users agree to is on an individual basis.  **Exhibit A** at § 11.

59.     The SSA prohibits Valve and Steam users from bringing or participating in any type of class or representative action.  It specifically "does not permit class, collective, or representative arbitration."  **Exhibit A** at § 11.D.

COMPLAINT- 10

60.     Despite that prohibition, Zaiger is recruiting tens of thousands of Steam users to participate in precisely that: collective and representative arbitration.

61.     The Funding Presentation lays out Zaiger's plan for collective/representative arbitration in plain terms: recruit 75,000 clients and then bring arbitrations on behalf of a subset (no more than 160) of those clients to drive a settlement on behalf of all 75,000 of its clients. **Exhibit B** at 3, 13.

62.     Zaiger has already begun implementing this plan.

63.     On March 24, 2023, Zaiger sent Valve a letter demanding that Valve enter into settlement discussions with Defendant for over 50,000 Steam user clients.  *See* **Exhibit E.**

64.     After a number of letters back and forth, in which Zaiger repeatedly refused to let Valve and Steam users engage in the SSA's required informal dispute resolution process, Zaiger filed for arbitrations on behalf of five of its clients.

65.     On information and belief, and based on the Funding Presentation, Zaiger intends to use these five arbitrations to attempt to drive settlement discussions with Valve for all of Zaiger's clients.

66.     Once again, Zaiger has led its Steam user clients to unwittingly breach the Steam Subscriber Agreement by engaging in prohibited collective/representative arbitration.

**E. Zaiger's Improper Focus on its own Potential Return on Investment**

67.     As detailed above, Zaiger is not focused on the legal or factual basis for its clients' alleged claims.  Nor is it concerned with helping those clients fulfill their obligations related to dispute resolution under the SSA.

68.     Instead, as shown by the Funding Presentation, Zaiger is focused solely on its, and its funder's, return on investment.

69.     This presents Zaiger with yet another ethical quandary, as lawyers are ethically bound to avoid conflicts of interest, which can arise if "there is a significant risk that the

COMPLAINT- 11

representation of one or more clients will be materially limited . . . **by a personal interest of the lawyer**." RPC 1.7 (emphasis added).

70.     As stated in a sworn declaration submitted by a former Zaiger attorney in an employment dispute, funding for the scheme against Valve was contingent on Valve immediately settling and Zaiger dropping any arbitrations filed on behalf of its clients if Valve so much as paid the arbitration filing fees:

> Mr. Deckoff said his funding was contingent on Zaiger LLC agreeing, in advance to drop the mass arbitrations and abandon the Steam Mass Arbitration clients if Valve paid its own filing fees in arbitration.  Given the total amount of Valve's potential fees, which would total hundreds of millions, in Mr. Deckoff's view, if Valve did not immediately settle the case upon notice that the Steam Mass Arbitration clients had paid their filing fees that suggested they were prepared to defend the individual arbitrations on the merits. Mr. Deckoff said that any litigation of the cases in that situation would be fruitless and that he was uninterested in paying for it.

**Exhibit F** at ¶ 32.

71.     In short, Zaiger placed its own interest and the interest of its funder ahead of the interests of its clients and proceeded with its scheme to extort a settlement from Valve—and enrich itself—despite knowing that it was breaching its ethical obligations.

72.     Zaiger and its funder are engaging in an egregious abuse of the litigation process, an abuse that is even more galling because it is coming at the expense of Valve's customers. Zaiger's and its funder's abusive behavior also constitutes tortious interference with the contractual relationship between Valve and its customers.

73.     Valve was, and is, willing and able to address its customers' concerns through Steam support and, as necessary, the individualized dispute resolution process called for by the Steam Subscriber Agreement.

74.     Zaiger and its funder improperly interfered in the Steam Subscriber Agreements between Valve and Zaiger's Steam user clients, specifically including the Zaiger clients for whom Zaiger has filed arbitrations.  Upon information and belief, Defendants will continue to

COMPLAINT- 12

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

improperly interfere with Steam Subscriber Agreements between Valve and Steam users.  Upon information and belief, the point of all of Defendants' actions against Valve is to improperly interfere in Valve's valid contractual relationships with its customers and to use the arbitration system to extort a settlement from Valve.

## CAUSES OF ACTION

75.     Valve asserts the following causes of action. Plaintiff reserves the right to modify or supplement its causes of action or the parties named in the action.

## FIRST CAUSE OF ACTION

## TORTIOUS INTERFERENCE

76.     Valve realleges and incorporates all allegations of this Complaint.

77.     Valve has valid contractual relationships and business expectancies in relation to the customers of its Steam platform, all of whom necessarily agreed to the Steam Subscriber Agreement.

78.     The Subscriber Agreement contains a dispute resolution clause requiring a good-faith attempt at informal dispute resolution and individualized arbitration.

79.     Defendants knew of the Subscriber Agreement and its terms.

80.     Defendants intentionally induced and/or caused Steam users to breach their respective Steam Subscriber Agreements with Valve as described above.

81.     Defendants' interference was for an improper purpose or by improper means.

82.     Valve has been damaged as a result in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## ABUSE OF PROCESS

83.     Valve realleges and incorporates all allegations of this Complaint.

84.     Defendants brought collective/representative arbitration claims against Valve in contravention of the terms of the Steam Subscriber Agreement's dispute resolution clause agreed to by Valve and Zaiger's Steam user clients.

COMPLAINT- 13

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

85.     Defendants' purpose in bringing the arbitration claims against Valve was to force Valve to enter into early and collective settlement negotiations that would financially benefit Defendants.

86.     That benefit to Defendants would be at the expense of Zaiger's purported clients and is an improper use of the arbitration process.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court award the following relief:

1.     For an award of damages and equitable relief against Defendants for Plaintiff's claims in an amount and of a nature to be determined at trial;

2.     For prejudgment and post-judgment interest on any portion of the damages award that is for a liquidated amount;

3.     For an award of attorneys' fees and costs incurred in this action, and

4.     For such other and further relief as the Court deems just, equitable, or warranted by law.

DATED this 20th day of October, 2023.

CORR CRONIN LLP

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
Jeff Bone, WSBA No. 43965
1015 Second Avenue, Floor 10
Seattle, Washington  98104-1001
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com
jbone@corrcronin.com

*Attorneys for Plaintiff Valve Corporation*

COMPLAINT- 14

# EXHIBIT A

10/6/23, 10:00 AM                                    Steam Subscriber Agreement

Install Steam    login    | language

 STEAM

**STORE**   COMMUNITY   ABOUT   SUPPORT

Home

# Steam Subscriber Agreement

## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & Agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/mediation/jurisdiction/attorney's fees
11. Dispute resolution/binding arbitration/class action waiver
12. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT AFFECTS HOW DISPUTES ARE RESOLVED. PLEASE READ IT. IF YOU ARE A CONSUMER AND LIVE IN THE PROVINCE OF QUEBEC (CANADA), THE EUROPEAN UNION, OR THE UNITED KINGDOM, SECTION 11 DOES NOT APPLY TO YOU.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT; ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as otherwise specifically authorized by Valve. You are responsible for the confidentiality of your login and password and for the security of your computer system. Valve is not responsible for the use of your password or Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or

fault. Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (such as The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce, publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not: in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment

method accepted by Steam. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency -- attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-OYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of

Steam Subscriber Agreement

Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats. You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

6. USER GENERATED CONTENT ▲

A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service. Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop

Steam Subscriber Agreement

Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT –

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.

- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND. EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT [OR DEPENDING ON YOUR LOCATION A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s) Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

9. TERM AND TERMINATION ▲

A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to a refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 12 will survive any expiration or termination of this Agreement.

10. APPLICABLE LAW/MEDIATION/JURISDICTION/ATTORNEYS' FEES ▲

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement will be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services; except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit. Subject to Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) below, you and Valve agree that any claim asserted in any legal proceeding shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts. In any dispute arising out of or relating to this Agreement, your use of Steam, your account, or the Content and Services, the prevailing party will be entitled to attorneys' fees and expenses (except arbitration -- see Section 11.C.)

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution  you may bring proceedings in the courts of the place where you are domiciled.

11. DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER ▲

This Section 11 shall apply to the maximum extent permitted by applicable law. IN PARTICULAR, IF YOU ARE A CONSUMER WHO LIVES IN A EUROPEAN UNION MEMBER COUNTRY, THE UNITED KINGDOM, THE PROVINCE OF QUEBEC (CANADA), AUSTRALIA, OR NEW ZEALAND, THIS SECTION 11 DOES NOT APPLY TO YOU. IF YOU ARE A CONSUMER WHO LIVES IN RUSSIA,YOU MAY UTILIZE THE ARBITRATION PROCESS IDENTIFIED IN THIS SECTION 11 OR YOU MAY USE LOCAL RUSSIAN STATE COURTS TO RESOLVE YOUR DISPUTE.

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com . If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

A. Must Arbitrate All Claims Except Intellectual Property, Unauthorized Use, Piracy, or Theft

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY. AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

However, this Section 11 does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and (ii) claims related to or arising from any alleged unauthorized use, piracy, or theft.

This Section 11 does not prevent you from bringing your dispute to the attention of any federal, state, or local government agencies that can, if the law allows, seek relief from us for you.

An arbitration is a proceeding before a neutral arbitrator, instead of before a judge or jury. Arbitration is less formal than a lawsuit in court, and provides more limited discovery. It follows different rules than court proceedings, and is subject to very limited review by courts. The arbitrator will issue a written decision and provide a statement of reasons if requested by either party. YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.

B. Try to Resolve Dispute Informally First

You and Valve agree to make reasonable, good faith efforts to informally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received, you or Valve may commence an arbitration. Written notice to Valve must be sent via postal mail to: ATTN: Arbitration Notice, Valve Corporation, P.O. Box 1688, Bellevue, WA 98004.

C. Arbitration Rules and Fees

The U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit. The arbitration will be governed by the Consumer Arbitration Rules (or the Commercial Arbitration Rules, if the Consumer Arbitration rules are inapplicable) of the American Arbitration Association ("AAA") as modified by this Agreement. Rules are available at http://www.adr.org. The arbitrator is bound by the terms of this Agreement.

The AAA will administer the arbitration. Outside the U.S., Valve will select a neutral arbitration provider that uses these or similar rules. It may be conducted through the submission of documents, by phone, or in person in the county where you live or at another mutually agreed location.

If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment. Valve agrees not to seek its attorneys' fees or costs unless the arbitrator determines your claims are frivolous or were filed for harassment. If you seek more than $10,000 and the AAA Consumer Arbitration Rules do not apply, the AAA's arbitration costs, including arbitrator compensation, will be split between you and Valve according to the AAA Commercial Arbitration Rules.

D. Individual Binding Arbitration Only

YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA'S RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does.

E. What Happens if Part of Section 11 Is Found Illegal or Unenforceable

If any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceeding begins), except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.

12. MISCELLANEOUS ▲

Except as otherwise expressly set forth in this Agreement, in the event that any provision of this Agreement shall be held by an arbitrator, court, or other tribunal of competent jurisdiction to be illegal or unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. Section 11.E. governs if some parts of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) are held to be illegal or unenforceable. This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

10/6/23, 10:00 AM                                   Steam Subscriber Agreement

This Agreement was last updated on April 25, 2023 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback

 © 2023 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries. VAT included in all prices where applicable.   Privacy Policy  |  Legal  |  Steam Subscriber Agreement  |  Refunds  |  Cookies 

About Valve  |  Jobs  |  Steamworks  |  Steam Distribution  |  Support  |  Recycling  |  Gift Cards  |  Steam  |  @steam

# EXHIBIT B

# MASS ARBITRATION STRATEGY AND INVESTMENT OPPORTUNITY

CONFIDENTIAL
PRESENTATION

1

# Mass Arbitration: Background

- In 2011, the Supreme Court held that contracts requiring mandatory arbitration and prohibiting class relief were permissible, provided they are not unconscionable. This ruling was reaffirmed in a 2013 decision.

- Many companies incorporated such clauses into their agreements believing it minimized exposure given the damages generally at stake for individual claimants.

- In an effort to avoid being deemed unconscionable, arbitration clauses adopted by companies seeking to avoid class actions routinely require the Company to pay all arbitration fees, limit circumstances where the Company can recover attorneys' fees, and allow the consumer to choose the manner of arbitration.

- Most arbitration providers — including the American Arbitration Association ("AAA") — charge a minimum of approximately $3,000 a case.

2

# Use of Mass Arbitration

- Over the past few years, a handful of firms — led by Keller Lenkner (now Keller Postman) — have weaponized consumer and employer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns.

- Aggregating claims makes entrance fee to just defend prohibitively expensive and the vast majority of such fees are non-refundable under recent precedent.

- For example, if 75,000 demands for arbitration are filed with the AAA, the Company has 30-days to pay a largely non-refundable fee of $225 million as the cost of admission.

- Claimants' counsel will offer a settlement slightly less than the AAA charge — $2,900 per claim or so — attempting to induce a quick resolution.

3

# The Technique and Typical Results

- In a mass arbitration against Uber, Keller Postman brought ~60k claims claiming drivers were misclassified as contractors rather than employees.

- Uber's challenge to paying AAA fees was unsuccessful, requiring Uber to pay the ~$180 million upfront if it wished to defend the claims.

- With an upcoming IPO, Uber declined to engage in protracted litigation and settled the ~60k claims early for $146mm.

- Uber Eats was targeted in the past two years and sought to enjoin the AAA from requiring what it called "astronomical" fees.  A New York appeals court recently denied the challenge finding that "[Uber] made the business decision to preclude class, collective, or representative claims in its arbitration agreement with consumers and AAA's fees are directly attributable to those decisions."

- In another case, Judge Breyer stated to Intuit "You knew what the rules of arbitration were. You knew all these things. And you elected to go to arbitration. . . . you are being hoisted by your own petard."

4

# Lifecycle of Investment

- **Stage 1 - Infrastructure:** $500,000 for software development, advertising and agreement templates, ethics opinions, hardware, marketing and survey consultants, and claim identification.

- **Stage 2 - Client Recruitment:** $2 to $150 advertising cost per client to recruit. Estimated spend of $3.75 million to recruit 75,000 clients at $50 an acquisition.

- **Stage 3 - Filing Cases:** Filing cost of $25,000 plus $50.02 a case, for an estimated filing cost of $3,776,500. (Never expended if an early settlement can be reached.)

- **Stage 4 - Active Arbitration:** Zaiger LLC litigates the first 20 cases, developing templates and models for use on additional cases. $12,000 a case after that to hire contract attorneys managed by Zaiger LLC to litigate disputes using templates and strategies. Most completed arbitrations seen to-date is 160, so total cost likely less than $1.7 million

5

# Target and Claim Identification

- **Active Approach:** Identifying 25 to 50 ripe targets, monitor news, and brainstorm claims.

   Identifying favorable arbitration terms including guaranteed refund of $50 filing fee, use of the AAA as an arbitration provider, application of California law, and language that suggests non-mutual collateral estoppel would apply.

   Ideal targets: (1) have valuation of ~$10 billion – high enough so they aren't judgment proof and can settle for hundreds of millions of dollars, but low enough that $200 million+ in arbitration fees creates an existential crisis forcing a quick settlement; and (2) a likely IPO or potential acquisition that will make carrying litigation risk unpalatable.

- **Automated/Passive Supplemental Approach:** Monitor court dockets for motions to compel class actions to arbitration, and copycat existing legal theories with potentially better advertising approach.

6

# Example Target: Valve Corporation

- Valve is an $11 billion company that dominates the market for digital PC game sales. Valve has over a billion customers with accounts. Valve's arbitration is administered by the AAA and specifies all filing fees will be reimbursed for claims under $10,000.

- In April 2021, game developers and consumers filed a putative class action claiming antitrust violations against Valve in the U.S District Court for the Western District of Washington.

- On October 25, 2021, Judge John Coughenor compelled the consumer claims to arbitration while retaining the developer claims. On May 5, 2022, Judge Coughenor denied (in part) Valve's motion to dismiss the developer plaintiffs' antitrust claims.

- If the proposed infrastructure were in place, today, we could immediately begin recruiting claimants to pursue the claims a federal judge has now ruled are well plead and potentially viable but for which *a billion* customers have been compelled to arbitration.

7

# New Merits-Based Approach

- The legal principles of non-mutual collateral estoppel prevent a company from relitigating a legal issue they have previously and unsuccessfully argued in another forum.

- This puts a company facing an arbitration in a situation where prevailing on the relevant legal issue is critical the first time it is argued, as a failure to prevail in that first case opens the door to preclusion in later cases.

- Rather than filing tens of thousands of cases at once, as is Keller's practice, a plaintiffs' firm could locate the strongest plaintiff from its pool, and file that case, and only that case, first.

- If that first, handpicked claim succeeds, all legal and factual issues that were inherent to the defendant should be resolved against them with respect to all other litigations, massively increasing the potential settlement value.

8

# Potential Returns

- Based on estimated costs of bundling claims, the initial Uber case would have cost Black Diamond ~$6.5 million and returned $43.8 million in less than a year (574% ROI).

- We believe a merits-based leverage approach — which can be implemented flexibly if a particularly strong claim presents itself — increases potential for even higher returns.

Assumptions:

> There is a 50% chance of winning the first case.
> The expected win, if there is one, is for a $10,000 judgment.
> A loss results in an average of a 25% reduction in claim settlement value.

- That results in an expected settlement value of $427.7 million. Black Diamond's recovery for funding at 30% would be ~$128.3 million (1874% ROI on $6.5 million investment).

9

Case 2:23-cv-01819-JHC    Document 1-3    Filed 11/27/23    Page 35 of 90

# Stage 1 Infrastructure Calculations

- **Will Bucher Fixed Compensation:** $150,000/year.

- **Software Engineer:** Est. $20,000/month full-time cost for 3 months, followed by $10,000/month part-time cost thereafter. $150,000 first-year spend.

- **Ethics Opinion/Consulting:** Est. $25,000 first-year ($700/hour as needed thereafter).

- **Marketing Part-time Employee or Consultant:** Est. $50,000/year.

- **Survey Design Consulting:** Est. $25,000/year.

- **Paralegal Support:** Managing claims dockets and answering calls. Possible need to scale up and hire additional support as clients are recruited. Est. $50,000 first-year spend.

- **Hardware and Software**: Computer hardware, Bloomberg and PACER alerts, additional Westlaw seat(s). Est. $8,000/yearly, plus $2,000 in hardware expenses year-one.

10

# Stage 2 Client Recruitment Calculations

- Most difficult to predict because it would vary per case based on the claim and how common users of the relevant product or service were.

- Present estimates are based on the following:

  - A Partner at a Bay Area law firm specializing in plaintiffs-side mass employment litigation — who has handled more than 60,000 employment arbitrations — said costs were between $2 and $150 a case, depending on the pool of plaintiffs and the case.

  - In "Bitter End" litigation, attorneys at Keller took the position that their lawyer group would be losing money if they accepted any settlement below $675 a case. Based on their retainer agreement, Troxel LLC, who was responsible for bundling the claims, received 4% of the settlement value. That implies an acquisition cost of no more than $27 a claim.

  - Facebook advertising costs around $1.00 per click. If it takes an average of two clicked-on ads to recruit a plaintiff, that's $2.00 a claim. If it takes 150 ads, that's $150.

11

# Stage 3 Filing Calculations

- **AAA Fees:** $100 a case for the first 500 cases, than $50 a case. Functional cost of $50 a case plus $25,000.

- **Zaiger LLC Server Costs:** $0.02 a client in server expenses to maintain client database and case files.

12

# Stage 4 Active Arbitrations Calculations

- In the "Bitter End" litigation, 160 cases were litigated to a conclusion. That is most cases ever fully litigated in a mass arbitration based on the 9 examples we are aware of. Plaintiffs' requests for fees in those arbitrations showed that Quinn Emanuel spent between 80 and 160 hours litigating each case. That litigation was surprisingly bespoke, with every briefing including one or more new, revised, or redacted arguments.

- If a Zaiger LLC target engages in a "Bitter End" strategy, the first 20 cases could be litigated by the Firm creating templates for use on additional cases. We expect a contract attorney working off Zaiger LLC prepared templates could litigate a case in 80 hours.

- We estimate that contract attorneys of sufficient caliber to arbitrate individual cases charge $100 to $125/hour. A performance bonus of $2000 for successful arbitrations could also be used to incentivize quality and results.

- Staffing with contract attorneys comes out to between $8,000 and $12,000 a case. Given the most completed arbitrations seen to date is 160, total cost is likely less than $1.7 million. There is flexibility in how we could "staff up" if needed too.

13

# Uber Settlement Calculations

- **Costs:** $50 recruitment (assumed) and $50 filing for 60,000 claims, plus $500,000 infrastructure costs. Total costs $6.5 million

- Settlement of $146 million. Hypothetical 30% return to Black Diamond of $43.8 million. Profit of $37.3 million. (574% ROI in less than a year).

- Merits Approach Assumptions:

  50% chance of winning the first claim;

  A win on the first claim increases the settlement value of each claim by $10,000;

  - For 60,000 claims, that's a $600 million increase in total settlement value.

  A loss on the first claim reduces the settlement value of each remaining claim by 0% to 50%, depending on how the arbitrator rules and on what grounds, with an average reduction of 25%. The reduction is the result of perceptions by a defendant of likely liability, not due to the creation of precedent. Plaintiffs are not bound by outcome, so there is little, if any, formal legal risk from the loss.

- Predicted, merits based outcome: spend $6,500,000. Upon a win, settlement value would increase to $746 million. Upon a loss, the settlement value would shift to an average of $109.5 million. That results in an expected settlement value of $427.75 million.

- 30% of $427.75 million is $128.325 million. $121.825 million profit (1874% ROI).

14

# EXHIBIT C

**Captured at: 2023/05/03 01:25 PM   URL: https://www.steamclaims.com/**



COHEN & GRESSER

# STEAM USERS ARE FIGHTING BACK

Tens of thousands of Steam users have engaged Zaiger LLC to hold Steam's owner, Valve, accountable for inflated prices of PC games. Valve forces game publishers to agree that they won't sell their games for less anywhere else. This stops other game sellers from trying to win your business by lowering prices. Valve's business practice violates U.S. antitrust law and, as a result, you could be entitled to hundreds or thousands in compensation on account of these illegal business practices.

**The best part? You pay nothing unless you get paid.**



Steam Antitrust Claim Form

First Name *

Last Name *

Email *

Country *
United States

Phone *

Previous   Next

**Captured at: 2023/05/03 01:26 PM   URL: https://www.steamclaims.com/**



COHEN & GRESSER

# STEAM USERS ARE FIGHTING BACK

Tens of thousands of Steam users have engaged Zaiger LLC to hold Steam's owner, Valve, accountable for inflated prices of PC games. Valve forces game publishers to agree that they won't sell their games for less anywhere else. This stops other game sellers from trying to win your business by lowering prices. Valve's business practice violates U.S. antitrust law and, as a result, you could be entitled to hundreds or thousands in compensation on account of these illegal business practices.

**The best part? You pay nothing unless you get paid.**

## Steam Antitrust Claim Form

Address 1 *

Address 2

City *

State *

Zip *

Previous   Next

**Captured at: 2023/05/03 01:27 PM    URL: https://www.steamclaims.com/**



COHEN & GRESSER

# STEAM USERS ARE FIGHTING BACK

Tens of thousands of Steam users have engaged Zaiger LLC to hold Steam's owner, Valve, accountable for inflated prices of PC games. Valve forces game publishers to agree that they won't sell their games for less anywhere else. This stops other game sellers from trying to win your business by lowering prices. Valve's business practice violates U.S. antitrust law and, as a result, you could be entitled to hundreds or thousands in compensation on account of these illegal business practices.

**The best part? You pay nothing unless you get paid.**

## Steam Antitrust Claim Form

Steam Name + Terms

What is your Steam Account Name? *

Your unique Steam Account Name may be different from your Public Display Name. You can find your Steam Account Name at the top of the "Account Details" page when in Steam.

By submitting this webform, you agree to the terms and conditions listed on this website, which include your consent for Zaiger LLC to email, call, or text you regarding your potential case.

Previous   Next

Captured at: 2023/05/03 01:29 PM    URL: https://www.steamclaims.com/


ZAIGER | COHEN & GRESSER

# STEAM USERS ARE FIGHTING BACK

Tens of thousands of Steam users have engaged Zaiger LLC to hold Steam's owner, Valve, accountable for inflated prices of PC games. Valve forces game publishers to agree that they won't sell their games for less anywhere else. This stops other game sellers from trying to win your business by lowering prices. Valve's business practice violates U.S. antitrust law and, as a result, you could be entitled to hundreds or thousands in compensation on account of these illegal business practices.

**The best part? You pay nothing unless you get paid.**

## Form

Settlement Preferences

How do you want to receive your settlement payment? *

◉ Check mailed to my address
○ Venmo

What is the minimum amount you would be willing to accept to settle your antitrust claim? *

◉ I want my attorneys to get me the highest settlement they believe is reasonably possible
○ $2,700
○ $900
○ The total amount I've spent on Steam
○ I want to be contacted directly with any settlement offers Valve makes
○ Other

[Previous] [Next]

 COHEN & GRESSER

# STEAM USERS ARE FIGHTING BACK

Tens of thousands of Steam users have engaged Zaiger LLC to hold Steam's owner, Valve, accountable for inflated prices of PC games. Valve forces game publishers to agree that they won't sell their games for less anywhere else. This stops other game sellers from trying to win your business by lowering prices. Valve's business practice violates U.S. antitrust law and, as a result, you could be entitled to hundreds or thousands in compensation on account of these illegal business practices.

**The best part? You pay nothing unless you get paid.**

## Steam Antitrust Claim Form

Antitrust Litigation Against Valve

Prior to today, did you know Valve engaged in anticompetitive conduct that raised prices for consumers like you? *

- ⦿ No
- ◯ Yes
- ◯ I'm not sure

Have you ever retained counsel to bring a claim against Valve before? *

- ⦿ No
- ◯ Yes
- ◯ I'm not sure

Previous    Submit

Captured at: 2023/05/03 01:30 PM    URL: https://www.steamclaims.com/



COHEN & GRESSER

# STEAM USERS ARE FIGHTING BACK

Tens of thousands of Steam users have engaged Zaiger LLC to hold Steam's owner, Valve, accountable for inflated prices of PC games. Valve forces game publishers to agree that they won't sell their games for less anywhere else. This stops other game sellers from trying to win your business by lowering prices. Valve's business practice violates U.S. antitrust law and, as a result, you could be entitled to hundreds or thousands in compensation on account of these illegal business practices.

**The best part? You pay nothing unless you get paid.**

## Steam Antitrust Claim Form

Thank you for providing your information. **Please check your email for a retainer agreement that you can sign digitally.** The email should arrive within 60 seconds. If you use Gmail, check your "Promotions" tab, as the email may end up there.

If you did not receive a retainer agreement, it may mean you did not qualify to file a claim. Please email us at steamclaims@zaigerllc.com if you have any questions.

# EXHIBIT D

(https://portal.steamclaims.com/)

My Info (/contact_info)    My Documents  1 (/signature_requests)    My Forms (/forms)

# Retainer Agreement 11.21.22

Cancel (/signature_requests) | Decline | Submit | | Sign

### Steam Antitrust Claims Retainer Agreement

This agreement is between you, ███████████, the client, on the one hand, and, on the other, Zaiger LLC, ("the attorneys" or "us").

1. Scope of Representation

We will represent you to the best of our ability and comply with all professional standards of competence and integrity. We agree to represent you in investigating and, if appropriate in the attorneys' opinion, filing an individual lawsuit or arbitration asserting claims of anticompetitive conduct, illegal monopoly maintenance, unfair competition, and similar claims (the "Matter") against Valve Corporation and its affiliates and subsidiaries (collectively, the "Company"). The attorneys shall have no obligation to represent you in any other matter, and no obligation to handle any appeal of any decision in this matter.

2. Attorneys' Fees

You will not owe the attorneys anything unless we are successful in collecting a recovery, payment to you, or settlement for your claim.

If your claim is successful, then you agree to pay to the attorneys a fee equal to 40% of the gross amount recovered for you.

Under no circumstances will the attorneys collect an unreasonably large fee.

Under no circumstances will you ever owe attorneys' fees beyond a portion of your recovery.

If your claim is successful, you agree to reimburse the attorneys from the remainder of the recovery for the expenses the attorneys advance on your behalf to pursue your claim. These expenses only include things reasonably necessary to pursue your claims, such as filing fees, postage, arbitration costs, court reporters, transcript fees, payments to expert witnesses and consultants, travel expenses, and all other litigation and arbitration expenses that we in our professional judgment determine to be reasonably necessary in connection with prosecuting or settling your claim. If we represent more than one client with claims similar to yours (which we intend to do), we may apportion expenses that go toward pursuing the claims of all clients on a pro rata basis among you and similar clients, but only if those expenses can reasonably be viewed as benefitting you and the other clients. Also, the law may, under certain circumstances, allow us to petition the court or an arbitrator for an award of attorneys' fees that the Company (not you) would have to pay. You agree that the attorneys may petition for that award and that any such award will belong to the attorneys. You grant the attorneys a lien to secure payment of the fees and expenses described by this agreement.

You acknowledge that any attorneys' fee sought by the attorneys in a litigation or arbitration on your behalf is intended to compensate them fairly in light of the complexity of the Matter, the risk and responsibility assumed, the time involved, the expertise brought to bear, and the results

achieved. You acknowledge that no one of the above factors controls, and that the time billed to the Matter is only one such factor. The attorneys agree to keep contemporaneous time records based on attorney and paralegal time charges, broken down to tenths of an hour, and shall file documentation reflecting the time billed to the Matter for the tribunal's consideration. You further acknowledge that the attorneys' fee is negotiable and the result of an arm's length transaction between you and the attorneys. This agreement is a contingency fee arrangement in which you pay 40% of any compensation we obtain for you, and pay nothing if you recover nothing. However, if you would like to retain us on an hourly basis, we are potentially open to that arrangement. The billing rate for Judd Linden is nine-hundred and seventy dollars an hour. The billing rate for Jeffrey Zaiger is one-thousand one-hundred and fifty dollars an hour. The billing rate for paralegal staff is between one-hundred fifty and three-hundred fifty dollars an hour. If you would like to negotiate an hourly billing contract or otherwise seek a different arrangement than the 40% contingency in this agreement, you can email steamclaims@zaigerllc.com.

## 3. Settlement Offers

You have the right to accept or reject any settlement offer made to you. You have indicated to us that you want your attorneys to obtain the highest settlement they believe is reasonably possible. We will negotiate on your behalf to achieve that result. We will not bother you with settlement offers that are *de minimus*, substantially below the average amount recovered for similarly situated plaintiffs, or for gift cards, discounts, or other non-cash compensation. For other settlement offers, we will notify you of the offer and you can decide whether to accept it. If the Company imposes a time limit on acceptance or rejection of the settlement offer, and we do not hear from you within one-day prior to the offer's expiration, and it has been at least thirteen days since we contacted you, we will accept the Company's offer on your behalf if we believe it is the highest settlement reasonably possible. Otherwise, we will reject the offer on your behalf under such circumstances. You can update your settlement preferences anytime via the web portal or by emailing steamclaims@zaigerllc.com (mailto:steamclaims@zaigerllc.com).

At Zaiger LLC we believe that consumers are best compensated with cash not coupons, which often go unused and are disfavored under federal law. As such, we will endeavor to obtain a cash settlement on your behalf. We recommend that you reject all non-cash settlement offers, but you have a right to accept a settlement offer for non-cash settlement against our advice. If you accept a non-cash settlement offer, and that non-cash settlement is non-divisible, you will be responsible for paying Zaiger LLC on a per hour basis for the time spent on your case, rounded up to the nearest hour, at the rates listed in Section 2. If you do not pay such fees within 30 days of receiving an invoice, and the non-cash settlement's value is less than our fee calculated on a per hour basis, we will retain that non-cash, non-divisible settlement as our entire compensation for the legal work pursued on your case, and you would owe nothing else. In the event we are able to sell such non-divisible compensation, the proceeds of such sale will be credited towards your balance and any amount received above the amount of your balance will be refunded to you via a check mailed to your address or, if we have the necessary information on file, a payment made to your Venmo account. For example, if the Company offered you a one-thousand dollar gift card, and we had spent five hundred dollars on a per hour basis on your case, and you accepted the offer, you would pay Zaiger LLC five-hundred dollars, and if you did not within 30 days, Zaiger LLC would take possession of the gift card and you would receive and owe nothing. If the non-cash settlement offer is divisible, and you accept it, Zaiger LLC will retain a portion of that settlement in an amount as close to, but never less than, 40% of the settlement amount, which may result in Zaiger LLC retaining more than 40% of the accepted settlement. If a joint cash and non-cash settlement is offered, and you choose to accept it, Zaiger LLC will, at Zaiger LLC election, be compensated with either the entirety of the cash or the entirety of the non-cash portion of the settlement, and you will receive the remainder.

## 4. Client's Duties

a. Contact Information – You agree to inform the attorneys by email to steamclaims@zaigerllc.com if you change your address, phone number, or email address. You agree to do so within two weeks of the change. The attorneys have to the right to stop representing you if they cannot reach you at the contact information you provide. You also understand that if your address changes, and you do not notify us, that may impact your ability to securely receive any settlement payment due to you.

b. Participation in Discovery – You may be required to locate and produce documents, answer written questions, or appear at a time and place to answer questions under oath. You agree to make yourself available to do these things on reasonable notice.

c. Participation in Hearing or Trial – If we cannot reach a prompt settlement with the Company, you agree to make yourself available to participate in a hearing or trial on your claims via Zoom or other videoconferencing software. In the unlikely event the arbitrator requires an in-person, rather than virtual, proceeding, it will be conducted at a location which the arbitrator determines is reasonably convenient for you.

d. Document Preservation – You must not destroy, delete, or discard documents and other information sources in your possession that are relevant to your potential claims. This includes physical, paper documents and electronic documents like email or social media posts, whether on a computer, phone, or other device. You agree and acknowledge that your failure to fulfill any of these duties is grounds for the attorneys to stop representing you.

## 5. Third-Party Liens

Certain third parties may have, or may assert in the future, liens on any recovery you might obtain. You recognize and understand that any liens must be resolved before we can distribute to you your portion of any recovery. You acknowledge that we may engage a company that specializes in resolving these types of liens, and that any fee paid to such company will be treated as an expense under this Agreement. Lien resolution could reduce or eliminate your recovery. If any liens on the proceeds of this matter are asserted, you authorize us to hold in trust any funds we reasonably believe are or may be subject to any liens until such liens are resolved and released.

## 6. Attorneys' Right to Withdraw

You acknowledge that the attorneys have the right to stop representing you at any time if, in their professional judgment and consistent with their ethical responsibilities, they come to believe that your potential claims are unlikely to result in a recovery for any reason, including, but not limited to, the Company's inability to pay, your lack of honesty, or if your refusal to accept an offer of settlement causes the attorneys to conclude that you have unreasonable expectations regarding the resolution of your claim.

## 7. Client's Right to Terminate Attorneys

You may terminate attorneys at any time by emailing steamclaims@zaigerllc.com (mailto:steamclaims@zaigerllc.com) from the email you provided starting the subject line with ATTORNEY TERMINATION followed by your name. If you do, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination.

## 8. Potential Conflicts

The attorneys intend to represent many clients with claims like yours. At this time, your interests and the interests of other clients align. We know of no conflicts of interest that would have an adverse impact on our representation of you. It is, however, possible that conflicts may arise in the future, including: (1) We discover that there is a limited pool of assets from which recovery is reasonably likely (for example, an insurance policy), and those assets are insufficient to pay all of our clients the full value of their claims. (2) A defendant offers an aggregate or "lump sum" settlement to all of our clients that does not specify the amount each client will receive. (3) A defendant offers to settle, but only if a certain percentage, or even all, of our clients accept the proposed settlement. We may also be required by the applicable rules of professional conduct to share material information about your claims and negotiating position with our other clients with similar claims. While we will try to avoid these issues if it is practical to do so, they might occur. If any of the above conflicts of interest affecting you does arise, you consent to allow us to continue representing you. If other types of conflicts arise, we will inform you promptly and work with you on how best to proceed in accordance with the applicable rules of professional conduct. We may currently or in the future represent one or more other clients in matters involving you and we may represent the parties that are adverse to you in this matter in other unrelated matters. We are

undertaking this engagement on condition that you give your express consent and agreement that we may represent other clients, including the parties adverse to you in this matter, in the future in other matters in which we do not represent you even if the interests of the other clients are adverse to you (including the appearance on behalf of another client adverse to you in an unrelated negotiation, litigation or arbitration), provided that the other matter is not substantially related to our representation of you and that in the course of representing you we have not obtained confidential information from you material to the representation of the other clients.

## 9. No Guarantee

You acknowledge that the attorneys have not and will not provide any guarantee about the outcome of your claims.

## 10. Association of Counsel

You acknowledge that the attorneys may associate with other counsel to assist with your potential claims and you authorize us to do so on written notice to you. We will pay for associated counsel without passing the expense on to you.

## 11. Entire Agreement and Choice of Law

This Agreement contains the entire agreement of the parties. It cannot be modified or canceled except in writing signed by all parties. This Agreement will be construed in accordance with the laws of New York notwithstanding choice of law rules.

## 12. Arbitration

We look forward to a productive relationship as your counsel. In the event of any dispute, controversy, or claim between us (or our respective heirs, successors, assigns, or affiliates) arising out of, relating to, or in connection with your engagement of us (any of the foregoing, a "dispute"), you and we waive the right to seek remedies in court, including the right to a jury trial, and agree to submit said dispute exclusively to binding individual arbitration. For disputes where less than $10,000 is in controversy, the arbitration should be conducted in accordance with Part 137 of the Rules of the Chief Administrator of the Courts (22 NYCRR), provided that arbitration is otherwise permitted under the rules. The arbitrator shall not have the authority to decide any claims as a class, collective, or representative action.

For disputes where greater than $10,000 is at issue, or for disputes less than $10,000 but for which 22 NYCRR does not permit arbitration, such dispute shall be resolved exclusively by final and binding confidential arbitration pursuant to the JAMS Comprehensive Arbitration Rules & Procedures, as they may be amended from time to time.  Any such arbitration shall be conducted in the State, County and City of New York and governed by the laws of the State of New York, without regard to choice of law principles.  The arbitration shall be conducted by a sole arbitrator appointed pursuant to JAMS rules. The arbitrator shall not have the authority to decide any claims as a class, collective, or representative action. The parties will share the expense of arbitration equally. Threshold issues of arbitrability shall be decided by the arbitrator, including the scope of this agreement and whether a controversy or claim arises out of or relates to your engagement of us.

You are not required to agree to the above paragraph for us to represent you. If you do not want the above paragraph to apply, simply let us know within 30 days of signing this agreement by sending an email to steamclaims@zaigerllc.com (mailto:steamclaims@zaigerllc.com) with the subject ARBITRATION OPT OUT followed by your name indicating that you do not want the arbitration provision of this agreement to apply. The above paragraph does not apply if it is prohibited by the applicable attorney ethics rules.

## 13. Power of Attorney – Execution of Documents

Consistent with the attorney ethics rules and other requirements for powers of attorney, you grant us the power of attorney to execute all documents connected with your claims.

## 14. Power of Attorney – CCPA

You grant us power of attorney and the authority to act as your authorized agent under the California Consumer Privacy Act. We will use this power of attorney to request data on your behalf that might be relevant to our representation of you, such as the amount you have spent with the Company. Like all information gathered on your behalf, this information will never be shared with third parties and, as our client, we will maintain the confidentiality of this information to the full extent permitted by law.

15. No Tax or Benefit Advice

You acknowledge and agree that the attorneys cannot and will not provide legal advice regarding the tax and government benefit implications of you receiving any settlement or sum of money.

16. Express Written Consent to Receive Text Messages and Automated Calls

You provide us and our designees and agents your express permission and authorization to send text messages and automated calls to the number or numbers you provide to us or our agents during the intake process and thereafter. You represent that you are the subscriber of those numbers and have the authority to give such consent. By executing this agreement, you authorize us to deliver or cause to be delivered to you telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice. You are not required to provide us this authorization for us to represent you. If you do not wish to receive text messages or automated calls, please let us know by sending an email to steamclaims@zaigerllc.com (mailto:steamclaims@zaigerllc.com) with the subject SMS CONSENT followed by your name.

17. Other Law Firms

You represent to us that you have not signed an agreement with another law firm to pursue any claims against the Company for you and that you do not recall signing such an agreement. To the extent you did and you do not remember, by signing this agreement, you are exercising your right to terminate any prior agreement with any other law firm in connection with your claims against the Company. You authorize the attorneys to communicate with any other firm about all issues related to any claims you have against the Company.

18. Authority to Sign

You represent that you have read and understood this agreement and have authority to sign it.

** ** **

We look forward to working to get you compensation for Valve's anticompetitive conduct on the Steam platform.

By:

Date: May 03, 2023

Name:

Email:

Phone:

Notices, Terms & Conditions (/terms)

# EXHIBIT E

# ZAIGER LLC
2187 Atlantic Street, 9th Floor
Stamford, CT 06902

Jeffrey H. Zaiger
Dir: (203) 347-7180
jzaiger@zaigerllc.com

March 24, 2023

**Via First Class Mail**
ATTN: Arbitration Notice
Valve Corporation
P.O. Box 1688
Bellevue, WA 98004

## Written Notice of Initiation of 30-day Good Faith Negotiation Period

To Whom It May Concern:

My law firm, Zaiger LLC, along with our co-counsel John Roberti and the antitrust team at Cohen & Gresser LLP, write on behalf of 53,738 clients we presently represent seeking compensation for Valve's illegal and anticompetitive practices in violation of the Sherman Act and state law.[1]

We write pursuant to Section 11 of the applicable Steam Subscriber Agreements (the "**SSAs**") to notify you of our intent to arbitrate our clients' individual claims.

Our clients' claims arise from Valve's anticompetitive practices relating to its Steam platform.[2]  Among other things, Valve has imposed its Platform Most Favored Nations Clause ("**PMFN**") on publishers, resulting in prices being charged to our clients that are grossly inflated from competitive levels, price competition being suppressed, and higher barriers to entry for new competitors being set.  Valve has also, through unlawful or improper means, discouraged and prevented new entrants and potential competitors from entering or competing.

All of these actions have had anticompetitive effects, in particular raising the prices charged by publishers on Steam's platform.  Through these actions, Valve has acquired and/or maintained its monopoly in PC game distribution, attempted to monopolize the market for PC game distribution, combined with publishers to

---

[1]      A list of our individual clients is provided in the accompanying flash drive (all clients are identified by a unique ID number to distinguish clients with the same name).

[2]      The conduct alleged by our clients is similar to the conduct alleged in the Consolidated Second Amended Complaint in *In Re Valve Antitrust Litigation*, Case No. 2:21-cv-00563-JCC (W.D. Wa.).

monopolize the market for PC game distribution, and entered into unlawful and anticompetitive agreements with game publishers.  These actions result in in violation of, *inter alia*, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and applicable state law, including without limitation state laws governing antitrust, unfair competition and unjust enrichment.  Our clients seek relief in the form of compensatory damages incurred by reason of Valve's illegal conduct, trebled, together with the cost of suit, including without limitation all arbitration costs, and reasonable attorneys' fees.  Our clients also seek interest pursuant to applicable state law.  In addition, our clients seek injunctive relief to end the unlawful conduct and prevent threatened loss or damage from Valve's continuing violations of law.

As contemplated by the SSAs, we are prepared to engage in good faith discussions to try to resolve our clients' claims before we initiate arbitration against you.  In furtherance of those discussions, we are enclosing a tolling agreement that we ask you to review and execute.  If you have any comments, please provide them to us promptly.

We will commence arbitrations on behalf of our individual clients if we cannot enter a tolling agreement or reach an amicable resolution with you within 30 calendar days.  If we are compelled to file arbitration claims, pursuant to the SSAs, our clients demand prompt reimbursement of all filing fees within 30 calendar days of filing.  If our clients incur any additional arbitration costs, including arbitrator compensation, and if Valve does not promptly reimburse those costs within 30 calendar days, we will move to compel payment and seek interest and other relief.

In light of the ongoing class action suit with developers in *In re: Valve Antitrust Litigation*, 2:21-cv-00563-JCC (W.D. Wa.), we trust you are aware of your duty to maintain and preserve all materials relating to these claims.  For the avoidance of doubt, please ensure that all potentially relevant documents and electronically stored information are preserved until the conclusion of our negotiations or the entry of final awards after completion of the anticipated arbitrations, including without limitation documents relating to (i) our clients' claims, (ii) Valve's development, communication and enforcement of its PMFN; (iii) the relevant market for PC gaming, including without limitation documents relating to market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets; (iv) Valve's review of publishers' proposed pricing on Steam, including its approval or rejection of such pricing, and (v) Valve's anticompetitive practices.

All communications with respect to these claims should be directed to me (jzaiger@zaigerllc.com) and to John Roberti (jroberti@cohengresser.com).  Please do not contact or communicate with our clients in any way.  We look forward to hearing from you promptly.

Yours truly,

Jeffrey H. Zaiger

cc:    John Roberti (by email)
        Judd Linden (by email)

## TOLLING AND STANDSTILL AGREEMENT

THIS TOLLING AND STANDSTILL AGREEMENT (the "**Agreement**") is entered into on and as of March ___, 2023 (the "**Execution Date**") between Valve Corporation ("**Valve**") and Zaiger LLC on behalf of the clients identified on the file included as a flash drive as Exhibit A herewith (the "**Clients**" and, together with Valve, the "**Parties**").

**WHEREAS**, on March 24, 2023, Zaiger LLC and Cohen & Gresser LLP served a "Written Notice of Initiation of 30-day Good Faith Negotiations Period" on Valve (the "**Initiation Letter**") identifying the Clients in Exhibit A and notifying Valve of the Clients' intention to arbitrate the Clients' individual claims against it; and

**WHEREAS**, the Initiation Letter advised Valve that Clients would initiate arbitration of their individual claims (the "**Arbitrations**") if the parties do not enter into a tolling agreement or reach an amicable resolution within 30 calendar days of the Initiation Letter; and

**WHEREAS**, Valve and the Clients believe that it would be mutually beneficial to postpone the commencement of the Arbitrations to promote good faith discussions to try to resolve the Clients' claims before the Arbitrations commence;

**NOW, THEREFORE**, in consideration of the mutual promises contained herein, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Valve and the Clients, by and through Clients' counsel, hereby agree as follows:

1.　　**Definitions.**　For purposes of this Agreement, the following terms have the following meanings:

(a)　　"**Time-Based Defenses**" means any unexpired or unelapsed statute of limitations, statute of repose, survival period, laches period, borrowing statute, or other time-related defense or claim, whether statutory, contractual, or otherwise, of any kind or

2327709.1

nature, whether foreign or domestic; and

   (b) "**Tolled Claims**" means any and all claims, actions, causes of action, allegations, controversies, suits, rights, liabilities, damages, costs, expenses, and disputes, of every kind or nature, including claims for compensatory, punitive, or exemplary damages, statutory damages, treble damages, claims for reimbursement, claims for costs, attorneys' fees, sanctions, judgments, losses, charges, claims for declaratory or injunctive (including public injunctive) or other equitable relief, and any and all complaints whatsoever, of every kind, nature, and description, under any law of any jurisdiction, whether at law, in equity, or otherwise, whether based on statute, regulations, common law, civil law, or any other type, form, or right of action, and whether foreseen or unforeseen, actual or potential, matured or unmatured, contingent or liquidated, known or unknown, suspected or unsuspected, accrued or not accrued, or apparent or unapparent, together with any counterclaims or defenses to any of the foregoing, arising out of or related to claims that were or could have been asserted in *Wofire Games, LLC, et al. v. Valve Corp.*, Case No. 2:21-cv-00563 (JCC) (W.D. Wash.) or were described in the Initiation Letter.

  2. **Tolling.**  Any and all Tolled Claims are tolled and extended for the duration of the period from the Execution Date to the Termination Date, as defined below (the "**Tolling Period**"), and the Tolling Period will not be included in determining the applicability of Time-Based Defenses with respect to the any Tolled Claim; <u>provided</u> that nothing in this Agreement shall revive any expired Time-Based Defense that is or was as of the date of this Agreement barred or extinguished by the passage of time, laches or otherwise.  For purposes of clarity, the tolling of the statute of limitations and other Time Defenses during the Tolling Period shall survive any

termination hereof, such that any Tolled Claim which would have been barred as a result of the expiration of the statute of limitations or other Time Defense with respect to such claim at any time during the Tolling Period may be brought by the Clients at any time prior to the termination of the Tolling Period and Valve may not assert the expiration of the statute of limitation during such period or any other Time Defense as a defense to any such Tolled Claim brought by Clients. Valve further agrees that it shall not interpose in any lawsuit or action between the Parties related to the Tolled Claims: (a) a defense that the applicable statute of limitations shall have expired during the Tolling Period and/or (b) any Time Defenses based on the passage of time during the Tolling Period. The agreement set forth in this paragraph 2 shall survive any termination of this Agreement.

3. **Termination.**  This Agreement shall terminate on the "**Termination Date**," which shall be the earlier of: (a) one calendar day after written notice by either Party of their intent to terminate this Agreement; (b) one year after the Execution Date; or (c) the maximum period provided under any applicable law governing the claims of any individual Client, including N.Y. General Obligations Law § 17-103.  Each Party has sole and absolute discretion to terminate this Agreement under subparagraph 3(a) of this Agreement for any reason or for no reason.

4. **Notices.**  Any notice relating to or arising out of this Agreement, including any notice of termination, must be delivered by First Class Mail and, in the case of any termination by Valve, to the Clients' attorneys' email addresses (or such other address as a Party may specify from time to time by notice given in accordance with this Agreement):

**For Valve**:

Valve Corporation
P.O. Box 1688
Bellvue, WA 98004

**For the Clients:**

Jeffrey H. Zaiger
ZAIGER LLC
2187 Atlantic Street, 9th Floor
Stamford, CT 06902
(203) 347-7180
jzaiger@zaigerllc.com

-and-

John Roberti
COHEN & GRESSER LLP
2001 Pennsylvania Ave, NW
Suite 300
Washington, DC 20006
(202) 851-2073
jroberti@cohengresser.com

5.    Nothing in this Agreement shall operate as an admission of liability or wrongdoing. Nothing in this Agreement constitutes an admission by any party that, in the absence of this Agreement, the statute of limitations and/or any other Time Defense has or would have run or become applicable, and this Agreement shall not be used in any proceeding as evidence of any such admission, express or implied.

6.    This Agreement may not be used or relied upon for any purpose other than the enforcement of its terms.

7.    This Agreement shall not be admissible in any proceeding and shall not be used by either party in any proceeding, except solely for the purpose of establishing, if the matter is contested, the tolling of any statute of limitations or other Time Defenses for the specific and limited period of time under such terms as are set forth in this Agreement.

2327709.1

8.      Nothing in this agreement shall operate as a waiver of or prejudice any party's right to assert that the statute of limitations or any other Time-Based Defenses have been tolled or have not yet run for reasons other than the execution of this Agreement.

9.      This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties.

10.     This Agreement constitutes the entire agreement and understanding between the Parties respecting its subject matter of tolling the Tolled Claims, and it supersedes any and all prior agreements between the Parties respecting its subject matter, whether written or oral.   This Agreement may not be extended or otherwise modified except in a writing signed by the Parties' representatives.

11.     This Agreement has been drafted with assistance of counsel for the Parties and shall not be construed in favor of or against any Party by reason of authorship.

12.     This Agreement may not be disclosed to any person other than the Parties and their attorneys, auditors, and agents except: (a) to enforce or effectuate the terms of the Agreement or to oppose the assertion of a time-related defense or claim; (b) with the consent of the other Parties; or (c) as required by law.

13.     This Agreement may be executed in counterparts.  Signature pages exchanged by fax or email, including electronic .pdf copies, have the same force and effect as originals.

*[Signatures on the Following Page]*

2327709.1

5

EXECUTED on and as of the date set forth above:

**For Valve:**

By: _____

Name:_____

Title:_____


**On Behalf of the Clients**

By: _____

Name: Jeffrey H. Zaiger_____

Position: Counsel for the Clients and Managing Member of Zaiger LLC

# EXHIBIT F

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| | : | |
| Zaiger LLC, | : | **INDEX NO.:** |
| Plaintiff, | : | |
| | : | |
| V. | : | **AFFIDAVIT OF** |
| | : | **WILLIAM BUCHER** |
| Bucher Law PLLC, | : | |
| | : | |
| Defendant. | : | |
|_____| : | |

**STATE OF _____}**

                            **ss:**

**COUNTY OF _____}**

1

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 66 of 90

I, William Bucher, declare as follows:

1.     I am an attorney admitted to practice in New York.

2.     I earned my bachelor's degree from Washington University in St. Louis, where I graduated *summa cum laude*. I earned my law degree from University of Chicago Law School, where I also graduated with honors.

3.     I am currently the principal of Bucher Law PLLC. I was recently terminated from my employment at Zaiger LLC, where I worked from August 15, 2022 to February 28, 2023. I have personal knowledge of the facts stated below, and would competently testify to these facts.

### How I Came To Build A Mass Arbitration Practice At Zaiger LLC

4.     For most of my professional career, and prior to Zaiger LLC, I worked for two large Amlaw 100 law firms, Debevoise & Plimpton and Fenwick & West, handling complex litigation matters, including antitrust, copyright, trademark, and data privacy claims.

5.     At Fenwick & West, my employer immediately prior to Zaiger LLC, I was exposed to the concept of bringing thousands of identical claims in arbitration at once against a single defendant. My practice at Fenwick & West focused on defending such mass arbitrations.

6.     Prior to joining Zaiger LLC, I was part of a mass arbitration team that litigated over 70,000 consumer arbitrations, of which most were settled. Our team litigated approximately 160 consumer arbitrations that were won by a merits decision or withdrawal with prejudice by the opposing side prior to a final merits decision. I appeared before arbitrators approximately fifty times, authored hundreds of documents including final merits briefs, and spent thousands of hours working on the cases. To date, I have never lost a consumer arbitration.

2

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 67 of 90

7.      As I continued to obtain success on behalf of corporate clients, however, I began to feel as though I was on the wrong side.  In particular, where corporate conduct causes harm to hundreds of thousands, if not millions, of consumers the normal method by which these consumers may receive justice is through class actions.  There, one or more class representatives can represent the interests of a class of consumers and obtain a recovery for all.  This was an efficient method of adjudicating these cases, particularly where the dollar values of each individual injury are low relative to the potential cost of litigation.  But businesses have stymied the class action device by making consumers–often through terms and conditions in a website–enter into mandatory arbitration clauses that not only required each individual consumer to file their dispute in arbitration and not a court of law, but prevented these claims to be resolved in any kind of class or consolidated basis and required each to be litigated on an individual basis.

8.      I began to see mass arbitration as a means of leveling the playing field once again. A skilled and well-resourced mass arbitration firm can represent tens of thousands of individual consumers in filed arbitrations and either negotiate a settlement for all of its clients or, if the defendant was unwilling to settle, litigate each of these arbitrations individually in a manner that was cost-effective given the common issues to all consumers.

9.      Further, I had ideas of how tens of thousands of claimants could be retained, kept up to date, and managed on separate arbitration cases with similar factual theories, by leveraging technology in new ways.  In other words, from what I had observed of mass arbitration firms, I thought I may be able to do it better and therefore provide greater value to those consumers in need of representation.

10.     On January 7, 2022, I had a telephone call with Jeff Zaiger, the principal of Zaiger LLC, about potentially building a mass arbitration practice at Zaiger LLC.  I viewed Zaiger LLC

as an attractive place to build a mass arbitration practice, in part, because Mr. Zaiger represented that he could not only offer me the infrastructure and resources of an existing firm to build my practice but that he had a close relationship with Black Diamond Capital Management LLC ("Black Diamond") as a potential source of funding mass arbitration cases. Mass arbitration cases are very capital intensive for a plaintiff because they must have the resources to file initial arbitration filing fees for tens of thousands of consumers. This means millions must be spent at the outset of a case, and without the funding to file the cases, a mass arbitration strategy cannot get off the ground.

11.     Mr. Zaiger explained that Zaiger LLC had historically worked exclusively for Black Diamond, its managed funds, portfolio companies, affiliates, investment partners, employees, and spouses of its founders. But Mr. Zaiger also expressed that he was looking to expand the firm's practice and was interested in the concept of mass arbitrations.

12.     On Jan 16, 2022, I sent Mr. Zaiger a six-page proposal outlining the mass arbitration strategy I was proposing to start at Zaiger LLC.

13.     On April 26, 2022, Mr. Zaiger, Ethan Auerbach ("Auerbach") of Black Diamond, and I met to discuss the mass arbitration strategy and my joining Zaiger LLC to lead it.

14.     With the help of Mr. Zaiger, I created a final slide deck outlining my mass arbitration proposal ("Mass Arbitration Slide Deck") on June 6, 2022. A true and correct copy of the Mass Arbitration Slide Deck is attached hereto as **Exhibit A**. That slide deck contemplated bringing a mass arbitration against Valve for their anti-competitive pricing restraints (the "Steam Mass Arbitration"). The Steam Mass Arbitration was the first mass arbitration strategy that I proposed to Jeff Zaiger that the new mass arbitration practice at Zaiger LLC could pursue. Mr.

Zaiger told me that he would be sending the Mass Arbitration Slide Deck to Black Diamond for consideration.

15.     On July 26, 2022, Mr. Zaiger sent me an offer of employment (the "Original Employment Offer"). A true and correct copy of the Original Employment Offer is attached hereto as **Exhibit B**. The Original Employment Offer stated that I was being hired to "lead the Firm's development and pursuit of mass arbitration strategies (the 'Strategies')." The Original Employment Offer specified in Section 1(b) that I would receive "a percentage of Z LLC's recovery from any cases brought pursuant to the Strategies commensurate with any percentage to be paid to Jeff Zaiger." The language was structured to give Mr. Zaiger and I co-equal shares to account for the fact that Zaiger LLC received only 40% of any recovery in contingent fees and to allow for the possibility that Zaiger LLC might enter into funding arrangements or otherwise that would require it to share a percentage of its contingent fees with others. But given that Mr. Zaiger owned 100% of Zaiger LLC, both Mr. Zaiger and I agreed that the contract was being worded in this manner to reflect that we would split any contingent fees realized by Zaiger LLC on a 50/50 basis. The Original Employment Offer specified that I would be an "at will" employee, and it provided: "the Firm may end your employment at any time for any or no reason."

16.     Although the economic terms of the Original Employment Offer were consistent with what I had discussed with Mr. Zaiger, I was wary. In particular, I wanted insurance that Zaiger LLC would not act in bad faith by hiring me, having me build the needed systems to manage a large volume of clients, then fire me and not compensate me for my work on the Mass Arbitration Strategies. I expressed my concerns to Mr. Zaiger and asked to revise the offer to ensure that I was fairly compensated if I built a mass arbitration practice at Zaiger LLC.

17.    Mr. Zaiger and I agreed that the employment agreement would be revised to state: "(i) if the Firm terminates your employment, without cause, you will be entitled to compensation outlined in Section 1(b) for services rendered and work performed on cases pursued pursuant to the Strategies while employed, on a *quantum meruit* basis, even if applicable revenue is received from such cases after termination." The revised agreement also included a provision that required good faith negotiation over my compensation under Section 1(b) in the event of any termination. The revised language stated "that good faith discussions regarding resolution of any payment of compensation outlined in Compensation Section 1(b) shall occur in the event of either party terminating employment." An offer of employment with the revised language was executed on July 27, 2022. A true and correct copy of the revised and final employment agreement is attached as **Exhibit C**.

18.    I started my employment at Zaiger LLC on August 15, 2022.

19.    On or around August 16, 2022, Black Diamond entered into an agreement to provide seed funding to Zaiger, LLC for the mass arbitration strategies in the amount of $500,000 (the "Seed Funding Agreement."). Mr. Zaiger showed me the agreement.

20.    Within two weeks, I launched a website that was dedicated to recruiting clients to participate in a mass arbitration against Valve Corporation ("Valve") based on allegations that it acted as an illegal monopoly in the PC gaming market. (I am a frequent speaker at the Game Developers Conference, chair of the Digital Games and New Media chapter of the American Bar Association, a member of the Video Game Bar Association, and a long-time user of Valve's product, Steam, myself – so this seemed like a natural fit despite the fact that – to my knowledge, neither of the other lawyers at Zaiger LLC had experience with mass arbitrations, cases related to video games, or the Steam product.) Within a month of starting, I created and ran the firm's first

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 71 of 90

advertising campaign. I identified needed software service providers to set up the system I envisioned. I integrated these systems to recruit clients, ultimately totaling in the tens of thousands. While technically complex, the result was the creation of a simple system for potential claimants to determine if they were eligible to file a claim, to retain Zaiger LLC and me as their lawyers, and for clients to communicate with Zaiger LLC and me. Clients could respond to any email or text they received and receive in-person answers from a Zaiger LLC employee, usually myself. Clients could also receive updates and view their documents through a web portal, enabling confidential communications to be delivered securely to the relevant claimants.

21.      The system I set up was wildly successful. The Seed Funding Agreement and Mass Arbitration Slide Deck estimated that it would take approximately a year to get the software infrastructure set up and manage mass arbitration claims. Within weeks of starting at Zaiger LLC, however, I set up the infrastructure to run mass arbitration campaigns, including advertising campaigns for potential clients, screening of clients for eligibility, sending them a custom retainer based on the preferences the client expressed at intake, digitally signing and filing the retainer, setting up a web portal that clients could ask questions and contact their attorneys through, and spent hundreds of hours communicating with clients. By the end of November 2022, my advertising campaign had recruited over 20,000 Steam Mass Arbitration clients to bring arbitrations against Valve. Whereas the Mass Arbitration Slide Deck had anticipated that it might cost up to $150 to recruit each client, the advertising campaign that I created recruited the initial 20,000 Steam Mass Arbitration clients for less than $7 each. By the time of my later departure from Zaiger LLC, I had spent nearly 1300 hours – over 95% of my time – on the specific Valve arbitration and the mass arbitration strategies. This resulted in approximately 48,000 clients deciding to retain me (and the Zaiger Defendants) as counsel for an arbitration against Valve.

7

Based on my knowledge and observations of the work put in by all attorneys during my time at Zaiger LLC, it is my understanding that my work on the Valve case dwarfed the contributions of the firm's other two attorneys, in both raw hours worked and percentage of total work hours dedicated to the Valve arbitration.

22.     My image and name were an integral part of the process by which Zaiger LLC acquired consumer clients for the Steam Mass Arbitrations.  I was the only attorney who appeared in the video advertisements potential mass arbitration clients saw. After clicking on an advertisement, potential clients were taken to a website where they could complete a form to determine if they were eligible. The website where clients completed claims forms 1) included a photo of Mr. Zaiger and me, 2) stated: "Jeffrey Zaiger, nine-time 'Super Lawyer' and 'New York Rising Star,' has teamed up with Will Bucher, chair of the American Bar Association's Digital Games and New Media Committee and Video Game Bar Association member to bring these antitrust claims against Valve. Together, we will negotiate, and if necessary litigate, your claim" and 3) contained a 90-second video, in which I, without another attorney, explained the legal merits of the case against Valve.  Every single eligible client received an email from "William Ward Bucher IV" noting that I was "Admitted to Practice in New York" inviting them to "review and sign our retainer agreement" and noting "Once you sign the retainer agreement, we can get started on your claim and obtaining compensation for you." No other attorneys were mentioned in this email. A true and correct copy of one instance of this email, sent to client Michael Schultz, who later forwarded it back to me[1], is attached hereto as **Exhibit D**. I was also specifically named first in the retainer agreement clients received. A true and correct copy of Michael Schultz's signed

---

[1] Mr. Schultz has expressly (in writing) waived privilege as to the communications with Zaiger LLC that are cited in this declaration.

version of this retainer agreement is attached hereto as **Exhibit E**. When clients completed the claims form and were eligible, they received a text message from "Will," not Mr. Zaiger or any other attorney. Tens of thousands of email communications were sent to clients bearing my name in the signature. A case update posted in January 2023 consisted of a video in which I, alone, explained the status of the case. Press articles regarding the case mentioned me and not any other lawyer. True and correct copies of such articles, each downloaded on March 31, 2023 and published about four weeks earlier, are attached hereto as **Exhibit F** and **Exhibit G**. When clients or potential clients had concerns about the legitimacy of Zaiger LLC as bona fide law firm that could take clients in the Steam Mass Arbitration, it was Zaiger LLC's policy to direct those clients to my LinkedIn page. Dozens, if not hundreds, of clients were directed to do so. Every single one of the clients retained prior to my departure receive at least one communication from "Will," "Bucher," or "William Ward Bucher IV." For the vast majority of these clients, I was the only attorney identified in any email or text they received from Zaiger LLC prior to February 28, 2023. Undoubtedly most, if not all, of these clients reasonably viewed me as their attorney.

23.     By mid-October 2022, it became clear the mass arbitration strategy would be successful, and additional funding would be needed for the Steam Mass Arbitration cases.

24.     In mid-October 2022, Mr. Zaiger also revealed to me that Black Diamond Capital had not been disbursing funds under the Seed Funding Agreement and that Mr. Zaiger has been paying costs from his own funds.

**Black Diamond Agrees To Fund The Steam Mass Arbitration Cases**

25.     On October 28, 2022, Mr. Auerbach, Mr. Zaiger, and one of Black Diamond's two General Counsels, Adam Tarken ("Tarken"), and I reached an agreement for Black Diamond's funding of the Steam Mass Arbitration cases and drafted a funding agreement ("October 28

9

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 74 of 90

Funding Agreement"), to which I was a party. The October 28 Funding Agreement contemplated the continued "employment of Bucher to lead the Firm's pursuit of the Strategies" and gave Black Diamond a four-year exclusivity period over similar mass arbitrations.

26.    Mr. Zaiger and I signed the October 28 Funding Agreement on that day. Mr. Auerbach stated that he was ready to sign but needed to call Steve Deckoff, Black Diamond's CEO, to confirm Steve Deckoff didn't want to review before Mr. Auerbach signed.

27.    Also on October 28, Zaiger LLC and I entered into a Partnership and Compensation Agreement. The Partnership and Compensation Agreement stated "WHEREAS, Jeffrey Zaiger and Bucher intend to organize as a partnership between themselves and, at Judd Linden's option, Judd Linden, to ensure the continued commitment of themselves to the Strategies and ensure fair compensation for all involved." The Partnership and Compensation Agreement further stated, "WHEREAS, Jeffrey Zaiger and Bucher intend compensation in the partnership to reflect that in Bucher's current employment agreement," The Partnership and Compensation Agreement specified that "Jeffrey Zaiger and Z LLC commit to compensate me, regardless of employment status, with a payout or percentage of any recovery from the Strategies equal to any percentage, payout, or allocation due to Jeffrey Zaiger from the Strategies, or one-half the profit earned by Z LLC from the Strategies, whichever is greater." A true and correct copy of this agreement is attached as **Exhibit H**.

28.    Mr. Zaiger told me that he had had a discussion with Mr. Decker, and that Mr. Deckoff offered his oral agreement to fund the mass arbitrations on the same substantive terms as listed in the October 28 Funding Agreement, to which I was a party. Auerbach and Zaiger requested that I begin distributing offers of funding to new arbitration clients. I expressed concern

10

regarding making offers to clients without a signed written agreement in place, Zaiger assured me that there was agreement with Black Diamond and it was just a matter of papering the agreement.

### Black Diamond Reneges

29.     In November 2022, Mr. Zaiger told me that Mr. Deckoff had begun expressing that he wanted substantive changes to the terms of October 28 Funding Agreement and that Black Diamond would no longer honor the oral agreement.  According to Mr. Zaiger, Mr. Deckoff said that he wanted Black Diamond to receive a higher percentage return than was contemplated in the October 28 Funding Agreement.

30.     Throughout November 2022, Mr. Zaiger relayed that Black Diamond continued to refuse to dispense amounts due under the $500,000 Seed Funding Agreement and was demanding that a new funding agreement would be negotiated to replace the October agreements before Black Diamond would honor its commitments under the Seed Funding Agreement.

### Black Diamond Makes Unacceptable Demands, And I Anger Them

31.     In the first week of January 2023, Sam Goldfarb, Mr. Zaiger, Mr. Deckoff, and I had a meeting concerning funding the cases.  Mr. Goldfarb was Black Diamond's other General counsel.  During that meeting, Mr. Deckoff proposed taking an equity interest in the Steam Mass Arbitration cases of 60% of fees otherwise owed to Zaiger LLC in its fee agreements with its Steam Mass Arbitration clients as compensation for the investment in the cases, plus repayment of the amount spent by Black Diamond with interest.

32.     Mr. Deckoff said his funding was contingent on Zaiger LLC agreeing, in advance, to drop the mass arbitrations and abandon the Steam Mass Arbitration clients if Valve paid its own filing fees in arbitration. Given the total amount of Valve's potential fees, which would total hundreds of millions, in Mr. Deckoff's view if Valve did not immediately settle the case upon

11

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 76 of 90

notice that the Steam Mass Arbitration clients had paid their filing fees that suggested they were prepared to defend the individual arbitrations on the merits. Mr. Deckoff said that any litigation of the cases in that situation would be fruitless and that he was uninterested in paying for it.

33.  I could not stay silent at the demand for a premeditated breach of the duties we owed our clients. I stated that the provisions that Mr. Deckoff and Black Diamond were demanding posed serious ethical concerns. I stated that as lawyers, Zaiger LLC and I couldn't take on cases we had no intention of pursuing and that a premeditated intention to abandon the Steam Mass Arbitration clients unless there was a quick settlement would be improper. I further stated that though Valve may have a strong incentive to settle quickly, we had to be prepared to litigate each of these individual consumer arbitrations if Valve was unwilling to settle. Mr. Zaiger agreed and stated that he was "a lawyer, not a snake oil salesman" and that he could not ethically take on cases he was unwilling to actually litigate.

34.  During the conversation, Mr. Deckoff stated: "Well whatever your ethical obligations, I'm sure there is some amount of money that would let you forget about them." He further stated that he went into finance, not law, because was unconcerned with ethics and that he wasn't going to invest the millions of dollars needed unless he controlled the venture.

35.  At this point, I expressed concerns about the level of control Black Diamond was contemplating taking in the mass arbitration cases.

36.  Mr. Deckoff stated that Black Diamond had to control the arbitrations because otherwise absent an early settlement the litigation could go on for years and Black Diamond was not interested in investing in years of litigation.

37.     I also observed that under the ethics rules a non-recourse, high interest loan was less concerning than the equity style investment Mr. Deckoff was proposing, and that the deal would be better structured that way.

38.     Mr. Deckoff stated that he was not interested in receiving only interest for his investment and that his demands were final.

39.     When Mr. Zaiger and I would attempt to propose alternative structures Mr. Deckoff stated and that his terms were non-negotiable. At one point, when I tried to propose an alternative structure, Mr. Deckoff immediately and loudly started repeating "no" in a child-like voice such that no one could hear what I was saying.

40.     During the meeting, Mr. Deckoff at times seemed noticeably frustrated or angry at the statements I was making about Black Diamond's demands to control the litigation, the ethical concerns associated with Black Diamond's demands, the lawyers' duties to their Steam Mass Arbitration clients, and the undesirable economics of Black Diamond's proposal.

41.     The week following the meeting, Mr. Zaiger expressed to me that I should have "cowered more" when meeting with Mr. Deckoff because he was billionaire accustomed to people doing what he says.  I was taken aback by this statement and stated that neither I, nor my tens of thousands of clients, would be well served by "cowering" to anyone.  I noted that "We're plaintiffs' lawyers now. We're in the business of suing billionaires. I'm not going to cower before Steve or Gabe [the CEO of Valve] if they don't offer our clients a fair deal."

**Mr. Zaiger And I Locate Alternative Funding**

42.     Given that Black Diamond had apparently reneged on its October agreement and wanted to impose unacceptable conditions on funding, Mr. Zaiger and I discussed exploring other funding options.

43. In January 2023, Mr. Zaiger and I obtained three term sheets from potential funders other than Black Diamond offering to fund the Steam Mass Arbitration. The best offer Zaiger LLC received was an offer from an alternative funder (the "Alternative Funder") for eight figures in funding as a non-recourse loan, repaid with interest depending on how long the case took to resolve and with no equity interest in the recovery.

44. Upon receiving the offer from Alternative Funder, Mr. Zaiger told me that he intended to share it with Black Diamond and see if Black Diamond was willing to match it. Over the coming days, Mr. Zaiger said that he had called and emailed Black Diamond many times but had received no response on whether they would match the funding terms and that he had told them that Zaiger LLC must receive Black Diamond's decision by January 22, 2023.

45. By January 22, Mr. Zaiger confirmed that Black Diamond had not responded. On January 23, Zaiger LLC executed a term sheet with the Alternative Funder.

**Black Diamond Discovers That We Are Seeking Alternative Funding And Decides That I Am To Blame.**

46. On February 8, 2023, Mr. Zaiger called me. Mr. Zaiger told me that on the prior day, Mounir Nahas, Black Diamond's Chief Operating Officer, came into Mr. Zaiger's office and seemed enraged that Zaiger LLC had accepted funding on the Steam Mass Arbitration cases from a source other than Black Diamond. Mr. Zaiger said that Mr. Nahas expressed anger that Mr. Zaiger would be doing any work that didn't directly profit Black Diamond and stated that there "would be consequences" for Zaiger LLC if Zaiger LLC proceeded to get funding from the Alternative Funder. According to Mr. Zaiger, Mr. Nahas confirmed that these "consequences" included that Black Diamond would withdraw all of its work from Zaiger LLC. Mr. Zaiger also

stated that Mr. Nahas expressed anger at me, said that I was the cause of Zaiger LLC straying from Black Diamond, and demanded that I no longer be allowed to come into Zaiger LLC's offices.

47.     Mr. Zaiger told me that given Mr. Nahas's comments, Mr. Zaiger feared losing Black Diamond's business.  Mr. Zaiger further stated that because Black Diamond was responsible for all of his current income, he couldn't survive if he lost their business. He also told me that his $1.2 million in savings was being managed by Black Diamond, that Black Diamond was asserting a supposed right to withhold that money if Zaiger stopped doing work for them, and that he was unwilling to risk losing that savings under any circumstances.  He said that everything possible had to be done to salvage the relationship with Black Diamond and that Zaiger LLC had to take a funding deal with Black Diamond to save the business relationship.  Mr. Zaiger also barred me coming into the office during working hours, because he said that he feared it would anger Mr. Deckoff and Mr. Nahas.

48.     I expressed my concern that Black Diamond had already reneged on the October funding agreement and had never paid the full amount of the Seed Funding Agreement.  This raised serious questions whether Black Diamond would enter into any future funding agreement or honor it, putting the claims of the Steam Mass Arbitration clients at risk.

49.     I further noted Mr. Deckoff's condition to funding that Zaiger LLC agree that the Steam Mass Arbitration clients be abandoned if Valve paid its initial filing fee.  I reminded Mr. Zaiger of his ethical duties and that it was impermissible to let one Zaiger LLC client, Black Diamond, who was not part of the Steam Mass Arbitration, dictate the cases of the tens of thousands of Steam Mass Arbitration clients.

50.     Mr. Zaiger responded that even if Zaiger LLC did want to act against Black Diamond's wishes, it would be very difficult to disentangle from Black Diamond because of Zaiger

LLC's complete dependence on Black Diamond. Mr. Zaiger noted that Zaiger LLC shared a bookkeeper, accounting, and human resources staff with Black Diamond. Mr. Zaiger noted that Black Diamond owned the building in which Zaiger LLC's office was located and that Zaiger LLC shared an office with Black Diamond and would need to locate new office space.

51.     I then expressed concerns that Black Diamond might ask Mr. Zaiger to terminate me. Mr. Zaiger replied that he wouldn't fire me and noted that even if I was terminated for some reason, we had a contract that would protect me.

52.     On Feb. 24 or 25, 2023, Mr. Zaiger asked me to come into the office on Sunday, Feb. 26, 2023. On Feb. 26, I walked into Mr. Zaiger's office, where Mr. Zaiger was having a speaker phone conversation with Mr. Deckoff.

53.     Mr. Zaiger did not notify Mr. Deckoff that I had entered the office or was listening to the conversation. Mr. Zaiger and Mr. Deckoff were discussing Mr. Deckoff's repeated demands Mr. Zaiger terminate my employment. Jeff asked: "Steve, what is wrong with Will?" Mr. Deckoff replied: "He's a fucking a loser. I know you think this is your golden ticket, but trust me, you'll regret it if you keep working with Will." Mr. Zaiger stated: "I need Will to run these cases." Mr. Deckoff responded: "If you need Will to run these cases, you're a shit lawyer Jeff."

54.     During the call, Mr. Zaiger stated: "Steve, I have ethical obligations to my clients I can't just ignore." Mr. Deckoff responded: "Fire Will, and you, me, and an ethics lawyer will sit down to figure out the ethics issues." Mr. Zaiger also stated: "I have a contract with Will. What am I supposed to do about that?" Mr. Deckoff replied: "Contracts are meant to be broken, Jeff."

55.     Following the call, Zaiger and I spoke and he expressed to me that he was very concerned that Black Diamond would terminate its business with Zaiger LLC. Zaiger told me that he needed to go to the bank the next morning because the firm didn't have a bank account that

wasn't controlled by Black Diamond. He explained that the accounts were in Zaiger LLC's name, but that Black Diamond staff could move money into and out of the account. Zaiger also told me that he didn't know that our keycards would work "after tomorrow," so that it was best to take anything I needed from the office. At Zaiger's request, I gathered my physical and digital files from the office. Zaiger instructed me to use an external hard drive from his office to bring home any data that I might need. Among the files I took home was a list of signed clients as of January 18, 2023, which I had previously downloaded in the ordinary course of my work on the cases.

56.     The morning of Feb. 27, 2023, Jeff Zaiger and Judd Linden, the only other attorney at Zaiger LLC, surprised me at my apartment around 9:30 AM, arriving unannounced.  Mr. Zaiger explained that Black Diamond had renewed its threat to stop doing business with Zaiger LLC if Zaiger LLC accepted funding from another source.  He also explained that Black Diamond had also threatened to sue Zaiger LLC if Zaiger LLC accepted funding from another source. Mr. Zaiger expressed that given these threats, Zaiger LLC had to meet Black Diamond's demands.

57.     I responded that Mr. Zaiger was placing his personal interests above those of his Steam Mass Arbitration clients, a violation of his ethical duties.  I noted that the Alternative Funder was ready to sign the final eight-figure deal that day.  I expressed ethical concerns about Zaiger LLC not finalizing the deal to fund their 48,000 clients without another viable offer on the table, since those clients expected to have their filing fees funded, which would total $3,600,000.

58.     Mr. Zaiger responded that under no circumstances could he afford to lose Black Diamond as a client.

59.     Following the February 27, 2023, meeting, I had serious concerns about Mr. Zaiger's ability to carry out his ethical obligations to clients.  I was concerned that Black Diamond completely controlled Zaiger LLC and Mr. Zaiger, and that if Black Diamond continued to demand

it, Mr. Zaiger would terminate my employment regardless of what was best for the 48,000 Steam Mass Arbitration clients. Given that I was the architect of the mass arbitration strategies and the only attorney at Zaiger LLC with consumer or mass arbitration experience, my absence would leave the Steam Mass Arbitration clients without competent representation. I was also concerned that, given the complete financial control and dominion Black Diamond had over Zaiger LLC and Mr. Zaiger, Black Diamond would gain *de facto* control over important legal decisions in the Steam Mass Arbitration cases, including whether or not those cases should proceed (or the clients abandoned) if Valve paid its filing fees. I was also concerned that Mr. Zaiger might terminate all 48,000 Steam Mass Arbitration clients if Black Diamond demanded he do so and refocus the firm on doing only work for Black Diamond.

### Mr. Zaiger "Loses [His] Mind"

60.     The evening of February 27, 2023, Mr. Zaiger informed me that the next morning, February 28, Mr. Deckoff, Mr. Nahas and Mr. Goldfarb would be holding a meeting to decide how they were going to direct Jeff Zaiger to handle "the situation" with the Steam Mass Arbitration cases. Mr. Zaiger stated he would call me after the meeting to inform me of Black Diamond's decision.

61.     On February 28, during the day, I tried to reach Mr. Zaiger by phone numerous times to receive an update on his discussions with Black Diamond but Mr. Zaiger refused my calls.

62.     Through the afternoon, Jeff Zaiger sent me erratic and alarming text messages: At 12:28 PM–"I'm kicking and screaming, Will … see your calling"; At 3:16 PM–"Three words: losing my mind"; At 4:47 PM "Will: I'm fighting for my life today – please give me a fucking beat." True and correct copies of these text messages are attached as **Exhibit I**.

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 83 of 90

63.     I did not take texts that Mr. Zaiger was "losing my mind" lightly.  Mr. Zaiger
seemed completely under Black Diamond's control, Black Diamond cared nothing for the Steam
Mass Arbitration clients, and Mr. Zaiger's communications led me to fear that he would do
something rash.

### I Try To Protect The Steam Mass Arbitration Clients

64.     I further concluded that my termination was imminent.  I understood that I had an
independent ethical duty to notify the 48,000 Steam Mass Arbitration clients that I would no longer
be their lawyer at Zaiger LLC, that I remained willing to represent them, and the means by which
they could make an informed choice to switch counsel.

65.     I therefore promptly took steps to safeguard my client's interests, to preserve the
status quo until it was clear what was going on, and to give Mr. Zaiger a "cooling off" period
before making any irreversible decisions with the Steam Mass Arbitration client database.

66.     I attempted to download a list of clients and their contact information from the
Leverage Law CRM software platform I had set up for the clients.  My attempt to download the
list was unsuccessful.  So I contacted Jeff Wettstein ("Wettstein"), the Chief Technology Officer
of the CRM software platform for assistance.  I did not receive an immediate response from Mr.
Wettstein.

67.     I temporarily adjusted Mr. Zaiger's administrative privileges on the CRM software
platform to prevent Mr. Zaiger from taking any massive and irreversible actions without a cooling
off period.  Following these changes, Mr. Zaiger still had full access to the system.  Mr. Zaiger
could still read and send emails to clients, review files, create documents, send texts, send
documents, review client upload, answer client questions, and even terminate clients.  I temporarily
ensured that Mr. Zaiger could no longer take mass actions, such as terminating all clients or

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 84 of 90

deleting all data, without first contacting me or Mr. Wettstein, while Jeff Zaiger was "losing [his] mind."

## Zaiger LLC Terminates Me Without Cause

68. Mr. Zaiger continued to refuse my calls throughout the evening. At 8:00 PM on that evening, Mr. Zaiger called me. Mr. Zaiger said he fought for me but had to terminate me. He also stated: "You get quantum meruit and that's it." I asked Mr. Zaiger to come over to my apartment to discuss my termination. Mr. Zaiger and Mr. Linden arrived shortly afterwards that evening at my apartment. Mr. Zaiger stated that he'd spent all day pleading with Goldfarb, Nahas, and Deckoff to try and keep me at the firm, highlighting my necessary expertise on mass arbitration matters. Mr. Zaiger said it was an impossible situation, where he couldn't get funding from Black Diamond without firing me and couldn't get funding from the Alternative Funder without being sued by Black Diamond. And, in any event, Mr. Zaiger reiterated that given his reliance on Black Diamond's business, he could not go against their wishes.

69. I expressed that I accomplished exactly what I set out to accomplish and had provided exemplary service to Zaiger LLC. Mr. Zaiger agreed that I had, and confirmed that my termination was not for cause and through no fault of my own. Mr. Zaiger stated that the personalities just got "crosswise" with Black Diamond, "they are pissed at you," and that the reason for my termination "was just a personality clash, and not with me."

70. I asked if my termination was effective immediately. Mr. Zaiger confirmed Black Diamond insisted I be fired and that he had to take steps immediately to terminate me otherwise he risked Black Diamond's ire. He further stated that Black Diamond controlled Zaiger LLC's email servers and that I would likely be cut off from Zaiger LLC email shortly, if I hadn't been already.

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 85 of 90

71.     Mr. Zaiger and Mr. Linden left my apartment at the end of the conversation.

72.     Later in the evening of February 28, Mr. Zaiger called me, angry, and stated that I had locked him out of the CRM software for the Steam Mass Arbitration clients.  I responded that I had not locked Mr. Zaiger out of the system but had temporarily suspended his ability to make irrevocable global changes to the database, stated that all access would be restored, and suggested we discuss any other concerns in the morning.

**Zaiger LLC Purports To Terminate Me A Second Time, This Time "With Cause"**

73.     Mr. Zaiger arrived at my apartment building around 11:30 AM on March 1, 2023, and delivered a letter purporting to terminate me "for cause."  The letter stated that I had changed Mr. Zaiger's access settings to that CRM software and that I had made an "unusual" request of Mr. Wettstein for his assistance in downloading client data.  At approximately 1:00 PM that day, I provided Zaiger LLC with all passwords needed to manage the advertising accounts, website, and other software and systems I had set up during my time at Zaiger LLC.

**Zaiger LLC Continues To Use My Name And Likeness To Solicit Steam Mass Arbitration Clients**

74.     Zaiger LLC had full control over the advertising and websites as of no later than 2:00 PM on March 1, 2023.  Following my termination, Zaiger LLC continued to run video advertisements on YouTube and Instagram that featured me, representing that I was a lawyer at Zaiger LLC, and inviting potential clients to see if they were eligible to file a claim.  It took days following my departure before references to myself were removed from the steamclaims.com homepage, which is what a user sees if they directly go to the website created to recruit clients. But even once references were removed from the homepage, for weeks following my departure,

subdomains of steamclaims.com continued to feature photos of and a video of myself explaining the legal merits of the Valve case.

75.     Further, for weeks following my departure, subdomains of steamclaims.com, including steamclaims.com/file and steamclaims.com/max, continued to note "Jeffrey Zaiger, nine-time 'Super Lawyer' and 'New York Rising Star,' has teamed up with Bucher, chair of the American Bar Association's Digital Games and New Media Committee and Video Game Bar Association member to bring these antitrust claims against Valve. Together, we will negotiate, and if necessary litigate, your claim."  When Zaiger LLC ran advertisements on Google Search, clients were directed to steamclaims.com/file and were not directed to steamclaims.com.  As a result, following my departure, potential clients who clicked on an advertisement on Google were led to a page that told potential clients that I would be handling their case.

76.     Zaiger LLC knew how to, and did, make adjustments to the homepage steamclaims.com.  But Zaiger LLC left the subdomains, to which potential clients are actually directed, with references to myself.  Potential clients who are eligible receive an email with instructions on how to sign the retainer agreement.  Following my termination, that email continued to include my signature block.  Potential clients who are eligible to file a claim receive a reminder text message if they have not completed their retainer agreement.

77.     Following my termination, I expressed my preference to Zaiger LLC and Mr. Zaiger to continue serving the clients jointly through a co-counsel relationship.  I reasoned that my continued involvement would serve the best interests of the clients.

**Zaiger LLC Sends A Unilateral Message To The Steam Mass Arbitration Clients That Fails To Provide Them Required Notice And Deprives Them Of An Informed Choice Of Counsel**

22

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 87 of 90

78.     While I was under the impression that Zaiger LLC was considering a co-counsel relationship, on March 25, 2023, Zaiger LLC unilaterally sent an email to clients informing them of a new, separate, co-counsel relationship which only briefly noted that I was no longer representing them.  The communication included no information on how to contact me, my new firm, my willingness to continue to represent the clients, or their right to make a choice as to whom to retain as counsel.  A true and correct copy of the substance of this communication is attached as **Exhibit J**.

### I Request That Zaiger LLC Provide Me A Complete List Of Steam Mass Arbitration Clients And Zaiger LLC Refuses

79.     Upon reviewing this unilateral message to the 48,000 Steam Mass Arbitration clients, on March 26, 2023, I requested from Zaiger LLC a complete list of all the Steam Mass Arbitration clients so I could fulfil my duty to notify clients that I had moved firms, was willing to still represent them, and give them a choice between retaining me as lead counsel at my new firm, remaining with Zaiger LLC, or choosing new counsel entirely.  I also stated that I needed the list so that I could run conflicts checks in connection with seeking employment with another firm or in my continued practice of law.  A true and correct copy of my letter is attached as **Exhibit K**.

80.     Zaiger LLC responded on March 29 and refused to provide me with a contact list of the Steam Mass Arbitration.  A true and correct copy of this response is attached as **Exhibit L**.

### I Use A Partial List In My Possession To Discharge My Ethical Duty To Provide Notice To At Least Those Clients I Can Reach

81.     Using the January 18, 2023, client list, I have been fulfilling my ethical obligation to provide my clients notice of my departure and allow them to make an informed choice regarding representation.  I sent a message to Steam Mass Arbitration clients on this list that: 1) I was no

longer at Zaiger LLC; 2) I was continuing my practice of law and was willing and able to continue representing them; 3) they could choose to remain with Zaiger LLC or they could choose to continue working with me. My message also gave clients a polling button that allowed clients to make the necessary ballot election to decide who would represent them going forward. A true and correct copy of my message is attached as **Exhibit M**.

82.    For those clients that requested further information, I responded to their inquiries.

83.    At the same time I began fulfilling my ethical obligation to provide my clients notice of my departure to the client whose contact information I had, I also brought legal action in the Federal Court of the District of Connecticut to secure a court order to ensure the remaining clients received notice I was no longer at Zaiger LLC, that I was continuing my practice of law and was willing and able to continue representing them, and that they could choose to remain with Zaiger LLC or they could choose to continue working with me.

84.    As of the date of this declaration, over 10,000 Steam Mass Arbitration clients have indicated through digital ballot that they wish to work with me rather than Zaiger LLC and signed agreements transferring their case to Bucher Law PLLC.

85.    On April 14, 2023, I emailed Mr. Zaiger the names of the over 9,000 that had conveyed their wish that I represent them rather than Zaiger LLC, and asked that Mr. Zaiger transfer those client files to me. A true and correct copy of my email is attached as **Exhibit N**.

86.    On April 18, 2023, my attorney, David Siegel, received a letter from counsel for Zaiger LLC, stating that Zaiger LLC was not in a position to comply with my request. The letter, among other things, accused me of making unilateral "misleading representations to the firm's clients" regarding their choice of counsel. A true and correct copy of this email is attached as **Exhibit O.** Mr. Siegel responded to counsel for Zaiger LLC's counsel later that day by email,

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 89 of 90

pointing out that it was Zaiger LLC who first unilaterally communicated with the clients regarding

Mr. Bucher's departure on March 25, 2023 and that Mr. Schwartz's letter of March 29, 2023 stated

that Zaiger LLC was expressly unwilling to provide the clients the information needed to make an

informed choice of counsel. A true and correct copy of this email from Mr. Siegel, which he shared

with me, is attached as **Exhibit P**. After Mr. Siegel asked whether Zaiger LLC was willing to agree

on a neutral, joint communication to all clients retained prior to my departure who haven't received

a unilateral communication from Bucher Law PLLC, Zaiger LLC's counsel refused.

87.     Jeff Zaiger and Judd Linden continued to unilaterally contact clients on this matter.

A true and correct copy of one example of this email, which a client contacted by Zaiger and

Linden forwarded to me, is attached as **Exhibit Q**.

88.     My counsel and counsel for Zaiger LLC continued to correspond from April 21 up

until the filing of this Motion for Preliminary Injunction.  Zaiger and I  agreed to *try* to send neutral,

joint communication to some number of clients, but continued to disagree regarding the content of

these communications and as to which clients this message should be sent. In the meantime, the

Zaiger Defendants also initially refused to turn over files for most of the approximately 10,000

clients who had already elected to continue with me as their lawyer *and* had provided a written

instruction that the Zaiger Defendants release their file to me. A true and correct copy of the April

25, 2023, letter from counsel for the Zaiger Defendants to Mr. Siegel refusing to turn over these

files, which Mr. Siegel then shared with me, is attached hereto as **Exhibit R**.   On April 26, 2023,

in an effort to sort out the issue of client notification procedure and language, and to entertain the

idea of broader settlement discussion, the Zaiger Defendants and I reached a standstill agreement

that prevented both sides from making filings in the District of Connecticut or the Steam Mass

Arbitrations, and prevented both sides from initiating further communications with the clients in

Case 2:23-cv-01819-JHC   Document 1-3   Filed 11/27/23   Page 90 of 90

question. Although the Zaiger Defendants still refused to transfer files for *all* of the clients who had signed instructions to transfer, once the standstill was in place, the Zaiger Defendants did transfer approximately 90% of the files in question.

89.     In May, under the threat of a pending Preliminary Injunction action in the case in District of Connecticut, Zaiger LLC agreed to send a joint communication to the approximately 14,000 clients who had not been informed of their choice of counsel.

90. Zaiger LLC now demands I cease all contact with my former clients, including hundreds who have indicated that they want to continue their case with me but haven't yet executed the needed transfer documents and those who have not yet made a ballot election to either stay with Zaiger LLC or continue their case with me.

91. I have offered, and remain willing, to work out a follow-up email to clients who are undecided that is either delivered jointly or is delivered by Bucher Law PLLC but attempts to resolve Zaiger LLC's perceived concerns. Zaiger LLC has expressed no interest in such cooperation, instead now seeking emergency relief in a different court than where this dispute is already pending.

I declare under penalty of perjury that the foregoing is true and correct.

By: _William Bucher_

William Bucher