UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION,<br><br>                    Plaintiff,<br><br>    vs.<br><br>ZAIGER LLC, and JOHN DOE CORPORATION,<br><br>                    Defendants. | No. 2:23-cv-01819-JHC<br><br>**DECLARATION OF JEFFREY H. ZAIGER IN SUPPORT OF DEFENDANT ZAIGER LLC'S MOTION TO DISMISS** |

Pursuant to 28 U.S.C. § 1746, Jeffrey H. Zaiger declares as follows:

1.      I am over 18 years of age and am competent to testify to the matters contained in this declaration. The facts set forth herein are within my personal knowledge except where otherwise indicated and, if sworn as a witness, I could and would testify competently thereto under oath.

2.      I am a lawyer licensed to practice in New York, Connecticut, and Massachusetts.

3.      Defendant Zaiger LLC ("**Zaiger**") is a limited liability company organized and existing under the laws of New York and its principal place of business is in Connecticut. Zaiger does not have offices, facilities, real property, employees, or agents for service in Washington State.

DECLARATION OF JEFFREY H. ZAIGER IN SUPPORT OF DEFENDANT
ZAIGER LLC'S MOTION TO DISMISS– 1
CAUSE NO. 2:23-cv-01819

4.      I am the Founding Partner, sole owner and member of Zaiger.

5.      I have one partner, who is licensed to practice in New York and Connecticut. Zaiger does not employ any other lawyers.  Neither I nor my partner have ever stepped foot in Washington State.

6.      Zaiger is not a participant in *Wolfire Games, LLC v. Valve Corp,* United States District Court for the Western District of Washington, Case No. C21-0563-JCC. It does not represent any of the plaintiffs in that action.

7.      Zaiger ran internet advertisements to recruit clients to pursue consumer claims against Valve similar to those set forth in *Wolfire* — namely, antitrust violations committed in connection with Valve's Steam PC gaming platform.

8.      These internet advertisements ran on social media platforms (Facebook, Instagram, TikTok, Youtube, etc.) and did not target a specific geographic area. Rather, they were designed and intended to reach Steam users subject to Valve's arbitration provision with certain demographics (age, hobbies, etc.) in all 50 states.

9.      The internet advertisements were the only advertisements Zaiger ran related to Steam.

10.      On September 1, 2023, I filed five Demands for Arbitration against Valve Corporation with the AAA on behalf of five of my individual clients. Attached hereto as **Exhibit 1** is a true and correct copy of one of the five Demands for Arbitration, with my client's name redacted. The other four demands are substantially similar. None of these clients on behalf of whom we filed Demands for Arbitration reside in Washington State.

11.      On October 24, 2023, after curing its failure to register with the AAA, Valve filed identical answers and motions to dismiss in the initial five cases. Attached hereto as **Exhibit 2** is

DECLARATION OF JEFFREY H. ZAIGER IN SUPPORT OF DEFENDANT
ZAIGER LLC'S MOTION TO DISMISS– 2
CAUSE NO. 2:23-cv-01819

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

a true and correct copy of Valve's Answer and Defenses to Claimant's Demand for Arbitration filed in one of the five actions, with my client's name redacted. Attached hereto as **Exhibit 3** is Valve's Motion to Dismiss for Lack of AAA Jurisdiction Under R-14, to Strike Request for Injunctive Relief, and for Reimbursement of Costs filed in one of the five arbitration actions, with my client's name redacted.

12.     Valve's Motions to Dismiss have not been decided.

13.     Zaiger is not involved in any litigation with Washington parties other than Valve and does not otherwise transact business in Washington.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 4th day of December 2023.

Jeffrey H. Zaiger

DECLARATION OF JEFFREY H. ZAIGER IN SUPPORT OF DEFENDANT
ZAIGER LLC'S MOTION TO DISMISS– 3
CAUSE NO. 2:23-cv-01819

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

**EXHIBIT 1**

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ████ | : |
| | : |
| | : |
| Claimant, | : |
| | : |
| v. | : |
| | : |
| VALVE CORPORATION, | : |
| | : |
| Respondent. | : |

No. _____

## <u>DEMAND FOR ARBITRATION</u>

Claimant ████, by and through undersigned counsel, respectfully submits this Demand for Arbitration against Respondent Valve Corporation ("**Valve**" or "**Respondent**") under federal and state antitrust laws and state unfair competition laws, seeking compensatory damages, trebled, together with interest, and the cost of suit, including attorneys' fees and arbitration costs, and public injunctive relief.  In support of his demand, ██ states as follows:

## <u>NATURE OF THE CASE</u>

1.      Gaming is among the most popular entertainment options in modern society.  One of the most popular ways to play is on a personal computer.  Personal computer games ("**PC Gaming**") are over $30 billion in annual worldwide commerce.

2.      Approximately 75% of this massive PC Gaming market flows through Valve, whose "Steam" gaming platform and integrated "Steam Store" are the dominant platform technologies in PC Gaming.   Given Valve, through its Steam Store and gaming platform, controls such a large portion of PC Gaming sales and use, game publishers must make their games available on Steam.  If they choose not to, they will fail to reach the vast majority of potential game buyers.

3.     Because the Steam Store dominates PC Gaming sales, Valve is able to impose on game publishers an outsized commission of 30% on each game sale, as well as sales of in-game content.  Valve's commissions — the so-called "Steam Tax" — are significantly higher than they would be in a competitive market.

4.     Valve has entrenched its dominant position by limiting price competition from rival platforms and stores, deterring entry and harming the competitive process.  It accomplishes this by mandating most favored nations treatment for its Steam platform in its contracts and practices. These Platform Most Favored Nation mandates ("**PMFNs**") prevent game publishers from selling their games at lower prices on rival platforms and stifle competition.   Valve also controls the pricing through which publishers can sell their games.  All initial pricing or adjustments are reviewed by Valve which has final say on whether or not the pricing will be permitted.  By engaging in such anticompetitive practices, Valve is able to extract its outsized commission on game publishers while insulating itself from real competition by alternative platforms and retail stores prepared to charge lower commissions.

5.     For example, assume that a game publisher wants to receive $35 in revenue for each sale of a new game it has created.  If that publisher sells on the Steam Store, it must offer the game to consumers for $50.  If there were no PMFNs, and a competitor platform offered a 10% commission, the publisher could offer that game for $40 on the competitor platform and make $36 on each sale while also increasing sales volume.  Instead, because of the PMFNs, the publisher must offer the new game at a price higher than $40 and potentially as high as $50 across all platforms, or risk being excluded from Valve and its massive audience on the Steam Store. PMFNs can deny consumers lower prices, restrict entry of new, lower-priced gaming platforms, and stifle innovation. There is no sufficient pro-competitive justification for Valve's PMFNs.

6.     Eliminating the PMFNs and Valve's anti-competitive tactics would open the door to alternative platforms competing with Valve by charging lower commissions and allowing game publishers to lower prices to consumers.  Valve's conduct forecloses this truly competitive market.

7.     But for the PMFNs, PC game consumers, like ▉ would pay substantially less for PC games.

8.     ▉ paid higher prices for his PC Gaming purchases as a result of Valve's anticompetitive conduct.

## PARTIES

9.     ▉ is an individual residing at ▉▉▉▉▉▉▉▉ who purchased PC Games on the Steam Store between 2017 and the present.

10.    Respondent Valve is the world's largest PC game distributor with over 130 million users worldwide. Valve is incorporated in the State of Washington and has its principal place of business at 10900 NE 4th Street, Suite 500, Bellevue, Washington 98004.  It operates the Steam Store, distributes PC games online, and contracts with PC Gaming publishers.

## JURISDICTION AND VENUE

11.    The American Arbitration Association ("**AAA**") has jurisdiction over this matter as a condition of Valve's Steam Subscriber Agreement ("**SSA**").  A federal court has ordered that claims such as the one being asserted by ▉ must be arbitrated.

12.    Every consumer who purchases a game from the Steam Store must check a box indicating their agreement to the terms and conditions of the SSA.[1]  Under Section 11(B) of the

---

[1]     Section 11 of the current SSA is uniform with earlier versions with respect to incorporating the AAA's Consumer Arbitration Rules.  A copy of the current SSA can be found at https://store.steampowered.com/subscriber_agreement/.  It is also attached as **Exhibit A** to this Demand.

SSA, "any claim[ ] arising out of . . . any aspect of the relationship" between the parties —
except those arising from inapplicable exceptions such as for intellectual property, unauthorized
use, privacy, or theft — are to be arbitrated and administered by the AAA and governed by the
AAA's  Consumer Arbitration Rules.

13.     Section 11(C) of the SSA provides that the arbitration "may be conducted through
the submission of documents, by phone, or in person in the county where [the claimant] lives" or
at "another mutually agreed location."

14.     On April 27, 2021, *Wolfire Games, LLC, et al. v. Valve Corp.*, was filed in the
United States District Court for the District of Washington asserting federal and state antitrust
claims against Valve.[2]  The *Wolfire* complaint alleged a proposed class including: "All persons
and entities who, directly or through an agent, purchased or sold a PC game on the Steam Store
in the United States from January 28, 2017 through the present (the 'Class Period')."[3] ▮
purchased PC games on the Steam Store during the Class Period.

15.     In the *Wolfire* case, Valve moved to compel arbitration of the named plaintiffs.
On October 25, 2021, Judge John C. Coughenour held that Section 11 of the SSA is a valid
agreement to arbitrate with respect to the PC Gaming consumers alleging Valve utilizes
anticompetitive practices and its monopoly powers to inflate games sold on the Steam Store in
the Wolfire Class Action.[4]  Judge Coughenour therefore ordered that the claims of a class of
Consumer Plaintiffs be stayed pending arbitration.

---

[2]     *Wolfire Games, LLC, et al. v. Valve Corp.*, 2:21-cv-00563-JCC (W.D. Wash. Oct. 25,
2021) ("**Wolfire Class Action**").

[3]     Complaint, *Wolfire Class Action* ECF No. 1 at ¶231.

[4]     Order, *Wolfire Class Action*, ECF No. 66 (the "**10/25/21 Order**") at 5.  A copy of the
10/25/21 Order is attached as **Exhibit B**.

16.     In his 10/25/21 Order, Judge Coughenour further held there was no basis to stay claims brought on behalf of developers who sold a PC game on the Steam Store (the "**Developer Claims**").[5]  On May 6, 2022, Judge Coughenour denied Valve's motion to dismiss the Developer Claims based on Valve's use of PMFNs.  In so holding, Judge Coughenour recognized that "[m]ost-favored nations restraints, such as those allegedly utilized by [Valve], are unlawful if used to further anticompetitive goals," and held that the Developer Claims were "sufficient to plausibly allege unlawful conduct" in this respect.[6]

## **FACTUAL BACKGROUND**

I.    **VALVE BUILDS A MONOPOLY IN PC GAMING THROUGH THE STEAM STORE**

17.     Valve was founded in 1996 as a video game development company.  After publishing several successful games, Valve created Steam in 2003.[7]  Steam originally served as an online system to fix bugs or flaws in the software of Valve's games, but with the release of its successful Half-Life 2 game in 2004, Valve turned Steam into an online store where users could also purchase the game.

18.     Shortly thereafter, Valve began contracting with third parties to digitally distribute their games on Steam in exchange for a share of the revenues.  Steam's success caused Valve to significantly shift its business model.  Steam has become the primary business of Valve, as over 50,000 games are now available on the Steam Store, mostly from third-party developers.

19.     As the Steam Store has grown, so too has Valve.  Valve's Steam Store generated

---

[5]     *Id.*

[6]     Order, *Wolfire Class Action*, ECF No. 80 at 6-7).

[7]     *About Us*, Valve Corporation, https://www.valvesoftware.com/en/about ("We created Steam in 2003 to serve as a digital content distribution channel, before app stores existed.").

revenue of approximately $10 billion for each of the last three years.[8]  In 2017, Steam generated over $4.3 billion worth of sales, not including in-game purchases and downloadable content ("**DLC**"), which are also significant sources of revenue.[9]  Steam is Valve's largest source of revenue because Valve collects a percentage of every sales transaction amount for sales of third-party games, DLC, in-game purchases, and other transactions.

20.     Valve's founder, Gabe Newell — whose personal net worth has been estimated between $3.9 and $5.5 billion[10] — has stated that the Steam Store is a "tremendously profitable" endeavor.  In fact, Newell has contended that on a per-employee basis, Valve is more profitable than tech giants Google and Apple.[11]

**B.     THE RELEVANT MARKET IS THE MARKET FOR PC GAMING**

21.     The market for the sale and distribution of PC games is a relevant antitrust market.  PC games are not substitutable with other forms of video games, such as console games or mobile games.  In fact, Valve has explained in court filings  that "Valve does not compete in [the mobile app] market," and that, in the context of another litigation involving Apple, Apple had provided "no evidence" that the "relevant market could be so broad as to include any video game available through any channel," and that there was "little evidence" that mobile "users

---

[8]     *See* https://www.usesignhouse.com/blog/valve-stats.

[9]     Joel Hruska, *Steam Earned an Estimated $4.3B in 2017, but Benefits Flow to Handful of Titles*, EXTREMETECH (Mar. 26, 2018), https://www.extremetech.com/gaming/266323-steamearned-estimated-4-3b-2017-benefits-flow-handful-titles; Arthur Zuckerman, *75 Steam Statistics: 2020/2021 Facts, Market Share & Data Analysis*, COMPARE CAMP (May 15, 2020), https://comparecamp.com/steam-statistics.

[10]    *See* https://www.forbes.com/profile/gabe-newell/?sh=f4192bf7da07.

[11]    Oliver Change, *Valve and Steam Worth Billions*, FORBES, https://www.forbes.com/sites/oliverchiang/2011/02/15/valve-and-steam-worth-billions/?sh=74676f1933f4 (Feb. 15, 2011).

owned multiple devices and changed from one to another in response to price changes."[12].

22.     PC games, console games and mobile games all require a unique device and hardware to play, and therefore they are not cross-compatible.  PC games require a personal computer and cannot be played on mobile devices or game consoles.

23.     Games made for consoles or mobile devices are not economic substitutes for PC games.  Each of these types of games have different user experiences and functionalities, and therefore different use cases for gamers.

### C.     VALVE HAS MONOPOLY POWER IN THE MARKET FOR PC GAMING

24.     Steam is the world's largest distributor of PC games, holding approximately 75% of the global market.[13]  Steam has had $10 billion in annual sales for at least the past several years.[14]

25.     Valve also collects voluminous and detailed data on its over 130 million users that it uses to further entrench its market dominance.[15]

26.     As a result of Valve's monopoly position, game publishers have no choice but to market games that are enabled for Steam to ensure they can reach consumers.  As one game publisher explained, "As a developer, it's scary to have one entrenched company dominating all

---

[12]     Joint Discovery Letter Brief Regarding Apple's Subpoena to Non-Party Valve Corporation, *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640 (N.D. Cal.), ECF No. 346 at 6-7.

[13]     Zuckerman, *75 Steam Statistics, supra* note 10; Hruska, *Steam Earned an Estimated $4.3B in 2017*, *supra* note 10 ("With 80 percent+ of the game distribution market, Steam has a lock on gaming that no other media outlet has ever enjoyed.")

[14]     *See, e.g.*, https://www.statista.com/statistics/547025/steam-game-sales-revenue/ ("[I]t is estimated that Steam generated more than 10 billion U.S. dollars in revenues in 2021").

[15]     *See, e.g.*, https://www.valvesoftware.com/en/jobs?job_id=4 (Valve job posting stating that that "[o]ne thing we have at Valve is data.  **Lots and lots of data**.").

of PC games since we are completely at Valve's mercy."[16]

27.     Publishers do not have other viable distribution options besides Steam.  Even publishers selling games on other platforms are often selling Steam-enabled versions of the game.

28.     The barriers to entry are so significant that even large video game publishers have been unable to succeed as strong competitors to Steam.  For example, Electronic Arts, a multi-billion-dollar AAA game studio, explained that it has to put its games on Steam to be "where the players are" — self-distribution through its own Origin store was insufficient to compete despite the popularity of its games.[17]

## VALVE'S ANTICOMPETITIVE SCHEME TO MAINTAIN STEAM'S MONOPOLY

29.     Valve has tremendous leverage over publishers, and it uses this leverage to stifle competition.  Valve engages in anticompetitive conduct to maintain its monopoly in the PC game distribution market through a series of policies and practices, including (i) the use of PMFNs for publishers who list games and DLC on the Steam Store; (ii) its right to review and veto prices proposed by game publishers for any reason at all; and (iii) the right to unilaterally exclude publishers from Steam for any reason and without recourse.

30.     Valve requires all game publishers who wish to sell Steam-enabled games to agree to a Steam Distribution Agreement and an accompanying set of rules (the "**Steamworks Documentation**.").

---

[16]     Nick Statt, *Epic vs. Steam: The Console War Reimagined on the PC*, THE VERGE (Apr. 16, 2019), https://www.theverge.com/2019/4/16/18334865/epic-games-store-versus-steamvalve-pc-gaming-console-war-reimagined.

[17]     Chaim Gartenberg, EA games are returning to Steam along with the EA Access subscription service, THE VERGE (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

31.     The Steamworks Documentation includes a provision that requires any game publishers that list games or DLC in the Steam Store to sell their Steam-enabled games (accessed through a "steam key") at the Steam Store price or higher in all distribution channels.[18]

32.     Likewise, if a publisher wants to sell a non-Steam version of its game on another platform, Steam will require the publisher to offer that game at the same or higher price it charges on Steam.  Valve enforces this policy in a variety of ways, including by delisting or threatening to delist games available at a lower price on other stores.

33.     Valve also requires game publishers to grant Valve veto power over their pricing in the Steam Store (the "**Price Veto**").  Valve's Price Veto allows Valve to "recommend" pricing for games and, critically, requires that "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are *usually* processed within one or two business days." (Emphasis added).  Given Steam's market position, the Price Veto is effectively power over pricing in the market as a whole.

34.     There is no valid, pro-competitive justification for Valve's policies and practices, including the PMFNs and the Price Veto.  Valve's market power and these mandates and policies allow it to control the terms of the transaction between the publisher and the consumer, including for transactions that take place off the Steam platform.

35.     The game publishers understand that they must fall in line with Valve's policies and practices or risk being precluded from Valve's audience of over 130 million users on the Steam platform.  Valve threatens non-compliant game publishers with punitive action, including

---

[18]     *Steamworks Documentation, Steam Keys*, STEAMWORKS, https://partner.steamgames.com/doc/features/keys (archived version from March 13, 2022) ("Steam keys cannot be sold on other sites unless the product is also available for purchase on Steam at no higher a price than is offered on any other service or website.")

removal of their Steam-enabled games, if they sell non-Steam-enabled versions of games at lower prices than what they are available for on the Steam Store.

36.     The effect of Valve's policies and practices is to: (a) raise prices to consumers, (b) prevent rival stores and platforms from competing on price, (c) discourage new entry by a lower commission-charging store or platform, (d) suppress output by game publishers, and (e) stifle innovation.

37.     Valve's anti-competitive policies and practices create a price floor, ensuring that game developers effectively cannot create versions of their games that are available for sale on other platforms at a price lower than on the Steam Store or face losing a mass audience of PC game players.

38.     As a result of Valve's policies and practices, prices are remarkably consistent across PC Gaming stores and platforms.  For example, prices for major titles are generally the same at both the Steam Store and the Epic Games Store, despite the fact that the Epic Games Store charges publishers a 12% commission while Valve charges 30%.[19]

39.     In those rare occasions where game publishers have attempted to forgo the Steam Store and market a game exclusively on the Epic Store, prices for that game are lower. However, this is not viable in the long term as publishers would sacrifice substantial revenues if they were unable to access potential purchasers on the Steam platform.

40.     If Valve was operating without imposing anti-competitive restraints on game

---

[19]     Kyle Orland, *Epic CEO: "You're Going to See Lower Prices" on Epic Games Store*, ARS TECHNICA (Mar. 20, 2019), https://arstechnica.com/gaming/2019/03/epic-ceo-youre-going-tosee- lower-prices-on-epic-games-store/ ("The Epic Games Store's much-ballyhooed 88-percent revenue share has been great news for developers who are no longer forced to accept Steam's de facto 70-percent standard. But this new behind-the-scenes monetary split hasn't resulted in savings for gamers, who thus far have seen the same price tags for games on Epic's storefront as on Steam (when titles are available on both).").

publishers, publishers would sell their games for a lower price through alterative platforms, such as the Epic Store.  Game publishers and stores like Epic could compete on price, driving volume and ultimately allowing them to gain sufficient scale to be competitive.  Because publishers are forced to sell their games on other platforms for the same price as they do on Steam, regardless of whether the alternative platforms offer them lower costs or commissions, the nascent competition from these platforms is stamped out.

41.    ███ was harmed because he paid higher prices for PC games across all platforms as a result of Valve's anti-competitive practices.  Additionally, consumers are harmed because game publishers are forced to sell through the Steam Store where they earn less revenue to invest in game improvements and new games, resulting in a reduction of choice and quality in the PC Gaming market.

### ███ **Damages**

42.    Claimant purchased hundreds of games and spent thousands of dollars using the Steam Store.

43.    Each of these purchases were made at a price higher than what would have existed but for Valve's anti-competitive practices.

### CLAIMS FOR RELIEF

### Count I (Monopoly Maintenance) (15 U.S.C. § 2)

44.    ███ hereby incorporates each of the allegations contained in the paragraphs above as if fully set forth herein.

45.    Valve — through its ownership and control of the Steam Store — has willfully acquired and maintained a monopoly in the PC Gaming distribution market and uses anticompetitive PMFNs, the Price Veto, as well as policies, practices and other conduct alleged

herein to maintain its monopoly.

46.     Valve, through its monopoly power and contracts, acts in an anticompetitive manner to control the price of games in the PC Gaming market, and to keep prices at a supracompetitive level.

47.     Valve's commission rate is substantially higher than it otherwise would be in a competitive PC Gaming distribution market, where rivals would charge lower prices and force Valve to compete.  Valve is able to maintain its supracompetitive rates through PFMNs, the Price Veto and other exclusionary and anticompetitive conduct alleged herein.

48.     ▇ has suffered and will suffer injury of the type that the antitrust laws were intended to prevent as a result of Valve's conduct in the form of higher prices and reduced quality.

**Count II (Attempted Monopolization) (15 U.S.C. § 2)**

49.     ▇ hereby incorporates each of the allegations contained in the paragraphs above as if fully set forth herein.

50.     In the alternative to the first cause of action, Valve, through its PMFNs, Price Veto and other conduct alleged herein, acts in an anticompetitive and exclusionary manner to control the price of games in the PC Gaming market, and to keep prices at a supracompetitive level.  Valve acts with the specific intent of monopolizing the PC Gaming distribution market and maintaining its supracompetitive commission rate.  Valve has a dangerous probability of achieving that monopoly.

51.     Through the PMFNs, the Price Veto, and other exclusionary and anticompetitive behavior alleged herein, Valve has a dangerous probability of success in monopolizing the PC Gaming distribution market.

52.   ▮ has suffered and will suffer injury of the type that the antitrust laws were intended to prevent as a result of Valve's conduct in the form of higher prices and reduced quality.

**<u>Count III (Unlawful Restraint of Trade) (15 U.S.C. § 1)</u>**

53.   ▮ hereby incorporates each of the allegations contained in the paragraphs above as if fully set forth herein.

54.   Through its contractual provisions, policies, and practices Valve enters into agreements, contracts, combinations, or conspiracies that compel game publishers to accept its PMFNs, which unreasonably restrain trade by controlling the price of games in the PC Gaming market, keeping prices at a uniform and elevated level.

55.   Valve's conduct, through the PMFNs, the Price Veto, its policies and practices and other exclusionary and anticompetitive behavior alleged herein, has an anticompetitive effect in the relevant market for PC Gaming distribution.

56.   Valve's conduct has no legitimate business purpose or procompetitive effect.

57.   There are less restrictive alternatives to the restraints Valve imposed.

58.   Valve's conduct has had a substantial effect on interstate commerce.

59.   ▮ has suffered and will suffer injury of the type that the antitrust laws were intended to prevent as a result of Valve's conduct in the form of higher prices and reduced quality.

**<u>Count IV (Violation of Washington Consumer Protection Act (RCW 19.86)</u>**

60.   ▮ hereby incorporates each of the allegations contained in the paragraphs above as if fully set forth herein.

61.   Valve's conduct, through the PMFNs, the Price Veto, its policies and practices

and other exclusionary and anticompetitive behavior alleged herein, constitutes unfair or deceptive practices.

62. Valve's conduct, through the PMFNs, exercise of its market power, and anticompetitive practices alleged herein, constitutes unfair methods of competition under Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

63. A PC Gaming marketplace without the restrictions imposed by the PMFNs, the Price Veto, and Valve's policies and practices and other exclusionary and anticompetitive behavior alleged herein, would result in true competition with rival stores with respect to the terms they offer to publishers to distribute PC games, and in turn compete for consumers in the PC Gaming marketplace.

64. Valve's anticompetitive practices alleged are contrary to public interest.  Valve's suppression of true competition and efforts to keep prices at a supracompetitive level harmed claimant █.

## REQUEST FOR RELIEF

WHEREFORE, █ respectfully requests that this Arbitrator:

a) Award, pursuant to 15 U.S.C. § 15 and/or the Washington Consumer Protection Act, damages, including compensatory and trebled damages, resulting from Valve's violations of the Sherman Act in an amount not less than $4,473.00, but in any event, not to exceed $10,000;

b) Award expenses and costs of arbitration, including all costs and fees and attorneys' fees;

c) Issue a permanent injunction pursuant to 15 U.S.C. § 26 and the Washington Consumer Protection Act, preventing Valve from enforcing its PMFNs and other anticompetitive and unlawful acts in violation of the Sherman Act and Washington Consumer Protection Act;

and

d)      For all other such relief as the Arbitrator may deem just, proper, and equitable.

Dated: September 1, 2023

Respectfully submitted:

**ZAIGER LLC**                                                                    **COHEN & GRESSER LLP**

_____/s/ Jeffrey H. Zaiger_____                        _____/s/ John Roberti_____

Jeffrey H. Zaiger                                                              John Roberti
Judd Linden                                                                     Derek Jackson
2187 Atlantic Street, 9th Floor                                    2001 Pennsylvania Avenue, NW
Stamford, CT 06902                                                       Washington, DC 20006
Tel: (203) 347-7180                                                      Tel: (202) 851-2073
jzaiger@zaigerllc.com                                                  jroberti@cohengresser.com
jlinden@zaigerllc.com                                                  djackson@cohengresser.com

                                                                                     -and-

                                                                                     Douglas J. Pepe
                                                                                     800 Third Avenue
                                                                                     New York, New York 10022
                                                                                     Tel: (212) 957-7605

# EXHIBIT A



Install Steam   login | language

**STORE**   COMMUNITY   ABOUT   SUPPORT

Home
# Steam Subscriber Agreement



---

## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/mediation/jurisdiction/attorney's fees
11. Dispute resolution/binding arbitration/class action waiver
12. Miscellaneous

This Steam Subscr ber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT AFFECTS HOW DISPUTES ARE RESOLVED. PLEASE READ IT. IF YOU ARE A CONSUMER AND LIVE IN THE PROVINCE OF QUEBEC (CANADA), THE EUROPEAN UNION, OR THE UNITED KINGDOM, SECTION 11 DOES NOT APPLY TO YOU.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT; ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscr ber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services access ble through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods from Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as otherwise specifically authorized by Valve. You are responsible for the confidentiality of your login and password and for the security of your computer system. Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or

fault, Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce, publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment

method accepted by Steam. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency -- attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of

Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats. You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

5. THIRD-PARTY CONTENT ▴

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

6. USER GENERATED CONTENT ▴

A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This License is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contr bution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contr butions users may be able to interact with, download or purchase the Workshop Contr bution. In some cases, Workshop Contr butions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distr bute, or continue to distribute copies of any Workshop Contr bution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscr bers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contr butions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license descr bed in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compat ble with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contr bution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop

Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.

- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

8. AMENDMENTS TO THIS AGREEMENT ▴

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

9. TERM AND TERMINATION ▴

A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 12 will survive any expiration or termination of this Agreement.

10. APPLICABLE LAW/MEDIATION/JURISDICTION/ATTORNEYS' FEES ▴

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services; except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit. Subject to Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) below, you and Valve agree that any claim asserted in any legal proceeding shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. Valve and you hereby consent to the exclusive jurisdiction of such courts. In any dispute arising out of or relating to this Agreement, your use of Steam, your account, or the Content and Services, the prevailing party will be entitled to attorneys' fees and expenses (except arbitration -- see Section 11.C.)

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

11. DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER ▴

This Section 11 shall apply to the maximum extent permitted by applicable law. IN PARTICULAR, IF YOU ARE A CONSUMER WHO LIVES IN A EUROPEAN UNION MEMBER COUNTRY, THE UNITED KINGDOM, THE PROVINCE OF QUEBEC (CANADA), AUSTRALIA, OR NEW ZEALAND, THIS SECTION 11 DOES NOT APPLY TO YOU. IF YOU ARE A CONSUMER WHO LIVES IN RUSSIA,YOU MAY UTILIZE THE ARBITRATION PROCESS IDENTIFIED IN THIS SECTION 11 OR YOU MAY USE LOCAL RUSSIAN STATE COURTS TO RESOLVE YOUR DISPUTE.

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

A. Must Arbitrate All Claims Except Intellectual Property, Unauthorized Use, Piracy, or Theft

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

However, this Section 11 does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and (ii) claims related to or arising from any alleged unauthorized use, piracy, or theft.

This Section 11 does not prevent you from bringing your dispute to the attention of any federal, state, or local government agencies that can, if the law allows, seek relief from us for you.

An arbitration is a proceeding before a neutral arbitrator, instead of before a judge or jury. Arbitration is less formal than a lawsuit in court, and provides more limited discovery. It follows different rules than court proceedings, and is subject to very limited review by courts. The arbitrator will issue a written decision and provide a statement of reasons if requested by either party. YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.

B. Try to Resolve Dispute Informally First

You and Valve agree to make reasonable, good faith efforts to informally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received, you or Valve may commence an arbitration. Written notice to Valve must be sent via postal mail to: ATTN: Arbitration Notice, Valve Corporation, P.O. Box 1688, Bellevue, WA 98004.

C. Arbitration Rules and Fees

The U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit. The arbitration will be governed by the Consumer Arbitration Rules (or the Commercial Arbitration Rules, if the Consumer Arbitration rules are inapplicable) of the American Arbitration Association ("AAA") as modified by this Agreement. Rules are available at http://www.adr.org. The arbitrator is bound by the terms of this Agreement.

The AAA will administer the arbitration. Outside the U.S., Valve will select a neutral arbitration provider that uses these or similar rules. It may be conducted through the submission of documents, by phone, or in person in the county where you live or at another mutually agreed location.

If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment. Valve agrees not to seek its attorneys' fees or costs unless the arbitrator determines your claims are frivolous or were filed for harassment. If you seek more than $10,000 and the AAA Consumer Arbitration Rules do not apply, the AAA's arbitration costs, including arbitrator compensation, will be split between you and Valve according to the AAA Commercial Arbitration Rules.

D. Individual Binding Arbitration Only

YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does.

E. What Happens if Part of Section 11 Is Found Illegal or Unenforceable

If any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceeding begins), except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.

12. MISCELLANEOUS ▲

Except as otherwise expressly set forth in this Agreement, in the event that any provision of this Agreement shall be held by an arbitrator, court, or other tribunal of competent jurisdiction to be illegal or unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. Section 11.E. governs if some parts of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) are held to be illegal or unenforceable. This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement was last updated on April 25, 2023 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback

---

 © 2023 Valve Corporation. All rights reserved. All trademarks are property of  heir respective owners in the US and other countries. VAT included in all prices where applicable.   Privacy Policy   |   Legal   |   Steam Subscriber Agreement   |   Refunds   |   Cookies     

About Valve   |   Jobs   |   Steamworks   |   Steam Distribution   |   Support   |   Recycling   |   Gift Cards   |   Steam   |   @steam

# EXHIBIT B

THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   WOLFIRE GAMES, LLC, SEAN COLVIN,          CASE NO. C21-0563-JCC
10  SUSANN DAVIS, DANIEL ESCOBAR,
    WILLIAM HERBERT, RYAN LALLY,              ORDER
11  HOPE MARCHIONDA, and EVERETT
    STEPHENS, individually and on behalf of all
12  others similarly situated,

13                       Plaintiffs,
14          v.

15  VALVE CORPORATION,

16                       Defendant.

17

18          This matter comes before the Court on Defendant's motion to compel arbitration (Dkt.

19  No. 35). Having thoroughly considered the parties' briefing and the relevant record, the Court

20  finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion

21  for the reasons described below.

22  **I.      BACKGROUND**

23          Plaintiffs are PC game consumers ("Consumer Plaintiffs") and a game publisher, Wolfire

24  Games, LLC, who allege that Defendant utilizes anticompetitive practices and its monopoly

25  powers to inflate prices on games sold and distributed through Defendant's Steam Store and

26  Steam Gaming Platform. (*See generally* Dkt. No. 34.) Plaintiffs assert six Sherman Act Section 2

ORDER
C21-0563-JCC
PAGE - 1

1   claims based on Defendant's alleged actual and attempted monopolization of the PC gaming

2   market, one Sherman Act Section 1 claim based on Defendant's alleged unreasonable restraint of

3   trade, and one Washington Consumer Protection Act ("CPA") claim based on Defendant's

4   alleged use of unfair and deceptive practices. (*Id.* at 89–96.)

5        Consumers wishing to purchase games through the Steam Store must check a box

6   indicating their agreement to the terms and conditions of Defendant's Steam Subscriber

7   Agreement ("SSA") before purchasing games. (*See* Dkt. No. 35 at 4–5.) The SSA includes a

8   provision requiring arbitration of "any claim[] arising out of . . . any aspect of the relationship

9   between us." (Dkt. No. 36-4 at 12, 65, 78, 92, 106, 120.) As a game publisher rather than a

10  consumer, Wolfire is not a party to the SSA.

11       Defendant moves to compel arbitration on the Consumer Plaintiffs' claims under the SSA

12  and to stay Wolfire's claims pending resolution of those arbitration proceedings. (*See generally*

13  Dkt. No. 35.) Plaintiffs, in opposing, argue that (a) the SSA's arbitration requirements are

14  substantively unconscionable; (b) some of the Consumer Plaintiffs are not a party to the SSA, so

15  not bound by the arbitration provision; and (c) staying Wolfire's claims is not warranted. (*See*

16  *generally* Dkt. No. 51.)

17  **II.      DISCUSSION**

18       **A.      Legal Standard**

19       In a motion to compel arbitration, the Court determines "(1) whether a valid agreement to

20  arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue." *Chiron*

21  *Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The party seeking

22  to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a

23  preponderance of the evidence." *Norcia v. Samsung Telecomm. Am.*, 845 F.3d 1279, 1283 (9th

24  Cir. 2017) (internal quotation marks and citation omitted). If an agreement exists, the Federal

25  Arbitration Act ("FAA") "leaves no place for the exercise of discretion by a district court, but

26  instead mandates that district courts *shall* direct the parties to proceed to arbitration." *Dean*

*Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985).

### B. Unconscionability

Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). However, Section 2 provides that arbitration agreements may be invalidated by generally applicable contract defenses, including unconscionability. *Id.*

Here, the question is whether Plaintiffs' unconscionability challenge should be determined by the Court or by an arbitrator. According to the SSA, the arbitrator must resolve any "disputes" regarding "this agreement" in conformity with AAA rules (*See* Dkt. No. 36-4 at 12, 65, 78, 92, 106, 120.) AAA rules give an arbitrator "'the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074 n.1 (9th Cir. 2013) (citing AAA Commercial Arbitration Rule 7(a)). Therefore, unless Plaintiffs challenge the SSA's delegation provision, specifically, as unconscionable, the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1132–34 (9th Cir. 2015) (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 65 (2010)). Here, Plaintiffs do not meaningfully challenge the delegation provision as unconscionable. (*See generally* Dkt. Nos. 51, 65.) Accordingly, the question of unconscionability should be determined in arbitration.

## C.    Parties Subject to the SSA

Plaintiffs next assert that two Consumer Plaintiffs, Susann Davis and Hope Marchionda, are not parties to the SSA and not bound by its arbitration provision because they did not purchase games directly through the Steam Store. (Dkt. No. 51 at 23–24.) Instead, according to their briefing, Ms. Davis and Ms. Marchionda's respective children purchased the games using their parents' credit card information. (*Id.*) In support of their position, Plaintiffs rely on another case involving Defendant's SSA—*G.G. v. Valve Corp.*, 799 F. App'x 557, 558–59 (9th Cir. 2020). (*See* Dkt. No. 51 at 23–24.)

In *G.G.*, the Ninth Circuit held that parents in a similar position to Ms. Davis and Ms. Marchionda were not bound by the SSA. *See* 799 F. App'x at 559. But *G.G.* reached this conclusion *based on a theory of equitable estoppel*. *See* Appellant's Reply Brief at 13 *G.G. v. Valve Corp.*, 799 F. App'x 557 (No. 19-35345). That is not the argument presented to the Court here, which is based on agency theory. (*See* Dkt. No. 56 at 9–11.)

According to the complaint here, Ms. Davis and Ms. Marchionda "purchased PC Desktop Games through the Steam Store" for their children. (*See* Dkt. No. 34 at 10–11.) As such, the question is whether they are bound by the SSA under an *agency theory*. *See, e.g.*, *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 272 (E.D.N.Y. 2019); *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 2013 WL 504757, slip op. at 2 (D. Mass. 2013). The Court finds that, under an agency theory, Ms. Davis and Ms. Marchionda effectively appointed their children as their agents when they purchased games on their parents' behalf using the parents' credit card information and their own Steam accounts. *See Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (general description of agency theory). Without this appointment, the parents would not have standing for the claims asserted here.

Accordingly, all of the Consumer Plaintiffs in this action, including those parents who purchased games through their children, are bound by the SSA's arbitration clause. Plaintiffs' motion to compel arbitration of the Consumer Plaintiffs' claims is thus GRANTED.

**D.      Claims Not Subject to Arbitration**

Defendant asks the Court to stay Wolfire's claims, which are not subject to the SSA's arbitration clause. (Dkt. No. 35 at 13–18.) The decision whether to do so "rests with the sound discretion of the district court." *United Commc'n. Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x. 412, 415 (9th Cir. 2002) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983)). Here, the Court concludes that a stay is not warranted. Specifically, a stay would prejudice Wolfire, which alleges ongoing harm from Defendant's allegedly unlawful practices. (*See* Dkt. No. 51 at 26 (citing Dkt. No. 34).) And Defendant fails to identify how it would be meaningfully prejudiced absent a stay. *See Dependable Hwy. Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (litigation costs alone are not sufficient to warrant a stay). Finally, staying Wolfire's claims would not promote judicial economy, as they would eventually need be addressed by this Court—the arbitrator's findings and conclusions on the consumers' claims would not bind the Court in how it addresses Wolfire's claims.

Accordingly, Defendant's motion to stay Wolfire's claims is DENIED.

**III.      CONCLUSION**

For the foregoing reasons, Defendant's motion to compel arbitration (Dkt. No. 35) is GRANTED in part and DENIED in part. Claims brought by Consumer Plaintiffs are STAYED pending arbitration. The remaining claims may proceed. The Clerk is DIRECTED to renote Plaintiffs' motion to dismiss (Dkt. No. 37) to today's date, October 25, 2021, as it is now ripe for the Court's consideration.

DATED this 25th day of October 2021.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

**EXHIBIT 2**

**MONTGOMERY McCRACKEN WALKER
  & RHOADS LLP**
John G. Papianou
Robert E. Day
1735 Market Street
Philadelphia, PA 19103
(215) 772-1500
jpapianou@mmwr.com
rday@mmwr.com

*Counsel for Respondent Valve Corporation*

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ▮▮▮▮ <br><br> Claimant, <br><br> v. <br><br> VALVE CORPORATION, <br><br> Respondent. | Case No. 01-23-0003-8818 <br><br> **RESPONDENT'S ANSWER AND DEFENSES TO CLAIMANT'S DEMAND FOR ARBITRATION** |

## DENIAL OF ALLEGATIONS

Pursuant to AAA Commercial Arbitration Rule 5[1] and AAA Administrator Janelle A. Manuel's October 10, 2023 correspondence, Respondent Valve Corporation ("Valve") generally and specifically denies all allegations in the Demand for Arbitration filed by Claimant ▮▮▮▮; denies that Claimant has any cause of action; and denies that Claimant is entitled to any form of relief. Valve reserves the right to supplement or amend its response to Claimant's allegations as its investigation proceeds.

---

[1]    Valve has concurrently submitted a motion to dismiss Claimant's Demand for lack of AAA jurisdiction over this matter. Valve incorporates those arguments by reference, but submits this Answer solely to preserve its interest.

## DEFENSES

In addition, Valve asserts the following defenses. In asserting these defenses, Valve does not assume the burden of proof as to any element or any claim for which the burden of proof is properly placed on Claimant.  Valve reserves the right to supplement or amend these defenses as appropriate while its investigation proceeds.

### FIRST AFFIRMATIVE DEFENSE

Claimant has violated the Steam Subscriber Agreement by pursuing a collective or representative action, which is prohibited.

### SECOND AFFIRMATIVE DEFENSE

Claimant has violated the Steam Subscriber Agreement by failing to follow its pre-arbitration procedural requirements—specifically, by failing to provide Valve proper notice of the claims and failing to engage in good faith discussions about them.

### THIRD AFFIRMATIVE DEFENSE

Claimant has failed to state a claim upon which relief can be granted.

### FOURTH AFFIRMATIVE DEFENSE

Claimant's claims are barred, in whole or in part, by the applicable four-year statutes of limitations.  *See* 15 U.S.C. § 15b and RCW 19.86.120.

### FIFTH AFFIRMATIVE DEFENSE

Claimant's claims are barred, in whole or in part, because any alleged injury or damages that Claimant may have suffered, which Valve denies, were not caused by Valve but are losses attributable to changes in competitive conditions and the demand for games Claimant purchased.

### SIXTH AFFIRMATIVE DEFENSE

Claimant is not entitled to the injunctive relief he seeks because he has an adequate

remedy at law, because Claimant agreed under the Steam Subscriber Agreement not to seek the broad injunctive relief articulated in his demand, and because the Steam Subscriber Agreement does not allow an arbitrator to award such relief.

SEVENTH AFFIRMATIVE DEFENSE

Claimant's claims are barred, in whole or in part, insofar as Valve's freedom to contract with developers would be infringed were the arbitrator to enforce a judgment against it.

EIGHTH AFFIRMATIVE DEFENSE

Claimant's claims are barred, in whole or in part, because Valve's revenue sharing percentage is commensurate with Steam's value to game publishers.

NINTH AFFIRMATIVE DEFENSE

Claimant's claims are barred, in whole or in part, because Valve has no duty to deal when it comes to its Steam keys policies. As long as Valve has a valid business reason for the terms it attaches to its Steam keys, which it does, those terms are not unlawful.

TENTH AFFIRMATIVE DEFENSE

Claimant's claims and requested relief are barred in whole or in part insofar as he lacks a sufficient evidentiary, legal, or constitutional basis to seek punitive damages.

ELEVENTH AFFIRMATIVE DEFENSE

Claimant's claims and requested relief are barred in whole or in part insofar as he is not entitled an award of costs or attorney's fees.

TWELFTH AFFIRMATIVE DEFENSE

Claimant's claims are barred because Valve acted lawfully and reasonably at all times and its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition.

<u>THIRTEENTH AFFIRMATIVE DEFENSE</u>

Claimant's claims are barred, in whole or in part, because Claimant sustained no injury in fact or antitrust injury or damages proximately caused by an act or omission by Valve.

<u>FOURTEENTH AFFIRMATIVE DEFENSE</u>

Claimant's claims are barred, in whole or in part, insofar as Claimant lacks standing to assert any or all of the claims in the Demand.

<u>FIFTEENTH AFFIRMATIVE DEFENSE</u>

The claims of the Claimant are barred in whole or in part to the extent that they seek or would recover damages or other relief that would duplicate in whole or part damages or relief sought or awarded in this action or any other action.

<u>SIXTEENTH AFFIRMATIVE DEFENSE</u>

Claimant is party to the Steam Subscriber Agreement with Valve that bars his claims, in whole or in part, because of applicable limitation of liability provisions contained therein.

<u>SEVENTEENTH AFFIRMATIVE DEFENSE</u>

Claimant's claims are barred, in whole or in part, by the doctrines of laches, waiver and/or estoppel.

<u>EIGHTEENTH AFFIRMATIVE DEFENSE</u>

Claimant's claims are barred, in whole or in part, by the doctrine of unenforceability and/or illegality, including without limitation unenforceability as against public policy.

Respectfully submitted,

Dated:  October 24, 2023

*/s/ John G. Papianou*

**MONTGOMERY McCRACKEN**
  **WALKER & RHOADS LLP**
John G. Papianou
Robert E. Day
1735 Market Street
Philadelphia, PA 19103
(215) 772-1500
jpapianou@mmwr.com
rday@mmwr.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2023, I caused a true and correct copy of the

foregoing Respondent's Answer and Affirmative Defenses to Claimant's Demand for Arbitration

to be served by email on Claimant through his counsel of record and AAA Administrator Janelle

Manuel.

Dated: October 24, 2023                                             *s/ John G. Papianou*
                                                                    John G. Papianou

                                                                    *Counsel for Valve Corporation*

**EXHIBIT 3**

**MONTGOMERY McCRACKEN WALKER**
  **& RHOADS LLP**
John G. Papianou
Robert E. Day
1735 Market Street
Philadelphia, PA 19103
(215) 772-1500
jpapianou@mmwr.com
rday@mmwr.com

*Counsel for Respondent Valve Corporation*

### AMERICAN ARBITRATION ASSOCIATION

|  |  |
|---|---|
| ████<br><br>Claimant,<br><br>v.<br><br>VALVE CORPORATION,<br><br>Respondent. | Case No. 01-23-0003-8818<br><br>**RESPONDENT'S MOTION TO DISMISS FOR LACK OF AAA JURISDICTION UNDER R-14, TO STRIKE REQUEST FOR INJUNCTIVE RELIEF, AND FOR REIMBURSEMENT OF COSTS** |

### INTRODUCTION

Though it's hard to tell on its face, Claimant ████ demand has little to do with his actual claim against Valve. Instead, it is one piece of an improper collective action orchestrated by Zaiger LLC ("Zaiger"), the law firm representing ██. ██'s participation in such an action, unwitting as it may be, is forbidden by the terms of the dispute resolution clause that he and Valve agreed to. It should be dismissed on this basis. Moreover, ██, through Zaiger, failed to follow the pre-arbitration procedures the clause requires. So this demand is not only improper; it is unripe.

Although Zaiger has filed arbitration demands on behalf of just five individuals,[1] this is the first time Valve has ever learned anything specific about any of their claims. For months, Zaiger has asserted that it represents not five, but *70,366* individuals, all of whom purportedly believe they were injured in the exact same way by the same anticompetitive conduct.[2] Zaiger briefly summarized this theory (which it copied from the allegations of a class action complaint filed in the Western District of Washington) in a few short letters it sent to Valve over the course of a few months. Until now, this Claimant and the four others were simply five entries in a 70,366-entry spreadsheet Zaiger appended to those letters. The letters consistently threatened to file 70,366 arbitrations if Valve refused to settle. Valve refused to be strongarmed, so Zaiger appears to have started by filing these five representative arbitration demands.

Zaiger's strategy here is obvious and—thanks to court filings—public knowledge. It has built a 70,366 "client" base (lured by a quick sign-up process and the promise of free money) so that it can coerce a multi-million-dollar settlement from Valve based solely on the threat of AAA filing fees and costs. Notably, that client base—and the threatened costs—appears to be growing. On October 20, 2023, Zaiger sent Valve another letter stating that it had added 2,690 new clients to its project.

Zaiger has no interest in arbitrating all 70,366 (or, with the new additions, 73,056) claims. It's playing a money game. Zaiger's focus is to achieve a collective settlement that, it projects, will provide a 1847% return on investment. As Zaiger's own documents show, it hopes

---

[1]    In addition to ▇, Zaiger represents ▇▇▇▇▇▇ (AAA Case No. 01-23-0003-8817), ▇▇▇▇▇ (AAA Case No. 01-23-0003-8815), ▇▇▇▇▇ (AAA Case No. 01-23-0003-8814), and ▇▇▇▇ (AAA Case No. 01-23-0003-8820).

[2]    For the arbitrator's convenience, Exhibit A comprises all correspondences between Valve's counsel and Zaiger in chronological order.

to use the five demands it has filed (including this one) as representative actions that, if successful, will help coerce a later collective resolution of the tens of thousands of remaining it has set aside.

In short, the demands should not be considered in a vacuum, but for what they are: a representative sample of claims from the collective action looming behind the scenes.  But Claimant's agreement with Valve, the Steam Subscriber Agreement ("SSA"), bans all forms of collective or representative actions.  For this reason alone, ▉ demand should be dismissed.

Claimant's demand should be dismissed for the separate reason that it is unripe.  The SSA requires Valve and each individual subscriber to engage in a simple, yet clear pre-arbitration dispute resolution process that starts with individualized notice and ends with a good-faith discussion about the subscriber's specific issues.  Zaiger never allowed that to happen: its notice and subsequent "discussions" spoke only about its clients *en masse* with abstract generalities.  And it rebuffed Valve's efforts to comply with this requirement—even its invitation to meet with each of Zaiger's clients one-on-one via Zoom—then filed this demand.

For these reasons, Valve respectfully requests that Claimant's demand be dismissed.

## BRIEF FACTUAL BACKGROUND

Valve is a video game company.  In addition to making its own games, Valve operates the Steam digital distribution and online gaming platform, which (among many other things) allows gamers to purchase and play games developed by companies other than Valve.  Steam is free to subscribers.  Over 80,000 games are available on Steam, and over 99% of them are made by persons other than Valve.

Zaiger's demands focus on Valve's third-party game distribution business on Steam.  In exchange for allowing third-party developers to sell their games on Steam, Valve charges the

developers a revenue share.  Valve's current standard revenue share starts at 30% of revenues received on games sold on Steam and drops to 25% or 20% once a game's sales reach certain levels.

Valve also gives video game developers a generous number of "Steam keys" (*i.e.*, digital codes) for free which allow those developers to sell their Steam-enabled games (*i.e.*, games made to be activated and played on Steam) in other stores or on their own websites.  Developers can also give Steam keys to journalists or influencers to boost sales.  Either way, Valve charges no revenue share on games sold or given away with Steam keys.

Zaiger claims Valve's game distribution business is anticompetitive and harms subscribers.  Specifically, Zaiger argues Valve's 30% revenue share is too high.  Demand ¶ 3. And Zaiger contends Valve "prevent[s] game publishers from selling their games at lower prices on rival platforms and stifle[s] competition," controlling game prices with a "veto power." *Id.* ¶¶ 3, 4, 33.  That, Zaiger says, causes game prices to be higher than they should be. *Id.* ¶¶ 6-7.

Zaiger's theories are not new.  They are the subject of an antitrust class action brought by game developers and publishers in the Western District of Washington. *In re: Valve Antitrust Litigation*, No. 2:21-cv-00563-JCC (W.D. Wash.).  Zaiger's demands essentially copy that complaint.  In fact, a few subscribers sought to represent a class of plaintiffs in that case, but Valve successfully moved to compel arbitration against them based on the arbitration clause in the SSA—the contract that grants gamers a license to use Steam and its content and services. *Wolfire Games, LLC v. Valve Corp.*, Case No. C2-0563-JCC, 2021 WL 4952220 (W.D. Wash. Oct. 25, 2021).

The SSA repeatedly emphasizes that subscribers agree to submit their disputes to individual arbitration.  Section 11 of the SSA, entitled "DISPUTE RESOLUTION/BINDING

ARBITRATION/CLASS ACTION WAIVER," emphasizes that neither Valve nor the subscriber can engage in any "CLASS OR REPRESENTATIVE ACTION … OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE." Ex. B, SSA at § 11.D.[3] Instead, it provides that all disputes will be resolved individually including, if necessary, that "YOU [*i.e.*, the subscriber] AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION." *Id.* § 11.A.

Before entering arbitration, the SSA requires that Valve and its individual subscribers try to resolve any disputes through a 30-day individualized dispute resolution process that begins with an informal discussion about the nature, basis, and requested relief for the individual's claim:

> You and Valve agree to make reasonable, good faith efforts to in-formally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) cal-endar days after the notice is received, you or Valve may com-mence an arbitration.

*Id.* § 11.B. The parties proceed to individual arbitration only if these informal efforts fail.

Much like arbitration, this is an individualized process between Valve and an individual subscriber. It requires either "party" (singular) to explain "the nature and basis" of his or her "claim or dispute" (singular) and "the relief sought" (singular). The provision does not invite other subscribers or other claims to be part of those individual discussions. To do so would

---

[3]     The SSA is available online at
https://store.steampowered.com/subscriber_agreement/#11.

undermine the whole point of Section 11: to engage in individual—not collective—resolution of disputes.

On March 24, 2023, Zaiger sent Valve a single, two-page letter on behalf of 53,738 individuals.  The letter included two paragraphs of conclusory assertions about Valve supposedly engaging in anticompetitive conduct.  Zaiger threatened to "commence arbitrations on behalf of our individual clients," unless Valve signed a mass tolling agreement and reached a global "amicable resolution."  *See* Ex. A, Correspondence at 2.  By August 8, 2023, the number of clients threatening arbitration ballooned to 70,366.  As of October 20, 2023, the number is at least 73,056.[4]

In response, Valve repeatedly explained to Zaiger that the parties were required under the SSA to engage in individual (not collective) good-faith negotiations between Valve and each client before starting arbitration.  To make that process work, Valve needs (and the SSA requires) a properly individualized notice regarding the nature and basis of each client's claim and the relief each client wants, so Valve can consider each one and respond in kind.  Valve even offered to sit down with each of Zaiger's clients to facilitate that process.

Zaiger refused.  It only wanted to discuss its clients' claims against Valve collectively and for Valve to pay it to settle all of those claims, together.  In other words, it wanted Valve to treat this as a collective action.  So, no individual notices were sent, no individualized negotiations occurred, and the 30-day process never began.

By pursuing a collective action, Zaiger was betting Valve would pay it huge sums of money upfront to avoid paying the AAA costs for arbitrating 70,366 claims.  But Valve was

---

[4]     At some point, Zaiger partnered with lawyers from Cohen & Gresser LLP in this venture, who also participated in this back and forth with Valve.  It is unclear what Cohen & Gresser LLP's role has been or will continue to be.

unwilling.  So Zaiger filed these five arbitrations, hoping to show Valve it's serious or to leverage favorable results in these "representative" cases to coerce a settlement for its remaining clients.

This is not guesswork or surmise.  This is Zaiger's business plan.  Zaiger outlined this exact strategy in a slide deck it presented to a third-party investor, Black Diamond Capital Management ("Black Diamond").  Indeed, Zaiger specifically targeted Valve for its size and consumer-friendly arbitration clause (noting that Valve agrees to reimburse filing fees for arbitrations filed in good faith seeking $10,000 or less).  The plan was to "recruit" as many clients as possible and use the AAA's costs as cudgel to coerce settlement.  Zaiger also suggested that, if necessary, it would initiate arbitrations for a small number of representative clients to keep its costs low, and use the threat of collateral estoppel to extract a collective settlement.  Zaiger projected that—based on AAA costs—it could develop a collective action with a projected return on investment of 1874%.

Zaiger's demands follow this blueprint.  But they violate the SSA.  Accordingly, Valve moves to dismiss them.

## ARGUMENT

## I.     CLAIMANT'S DEMAND VIOLATES THE SSA BECAUSE IT IS DESIGNED TO SERVE AS REPRESENTATIVE OF A COLLECTIVE ACTION.

The SSA prohibits both representative and collective actions.  That's stated in the SSA in all caps.  Ex. B, SSA § 11.D.  Despite filing just five individual demands, Zaiger has blatantly ignored this provision, because it is using these five claimants as representatives of over 70,366-member collective action that abuses both the AAA's costs and violates the SSA.  Indeed, that is how Zaiger (1) pitched its scheme to funders; (2) designed its "client"-onboarding process; and

(3) negotiated with Valve once enough people had signed up.  This demand, like the four others, must be dismissed.[5]

A.    **Zaiger Designed This Collective Action to Strong-arm Valve into a Collective, Multi-Million-Dollar Settlement and Procure a 1847% Return on Investment.**

Zaiger detailed its plan in a slide deck that it presented to a potential third-party funder, Black Diamond (a hedge fund).  Ex. C, Slide Deck.  The deck outlines a four-step procedure for "weaponiz[ing] consumer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns" and leveraging the AAA's costs to make the "entrance fee to just defend prohibitively expensive" and "induce a quick resolution."  *Id.* at Slide 3.

First, Zaiger had to set up the operation—including software development, hardware, "agreement templates," and "marketing and survey consultants"—all of which would cost $500,000.  *Id* at Slide 5, 10-13.  Second, Zaiger had to engage in "client recruitment."  *Id*.  The cost to recruit was calculated on an advertising-cost-per-client basis and, assuming 75,000 clients at "$50 an acquisition," was estimated to be $3.75 million.  *Id*.  Third, Zaiger would pay filing fees, but only (it was careful to note) if the company didn't settle.  *Id*.  The projected filing fees were $3,776,500.  *Id*.  Fourth, Zaiger planned to "litigate[] the first 20 cases, developing templates and models for use on additional cases" that would cut costs in later arbitrations.  *Id*. Zaiger noted that, in a previous collective arbitration against a different company, no more than 160 had been completed, so the cost to pursue its plan against Valve would "likely" be less than $1.7 million.  *Id*.  Nowhere in this process (or anywhere else in the slide deck) did Zaiger even

---

[5]    The SSA also clarifies that if anyone asserts that the SSA permits "class, collective, or representative arbitration"—notwithstanding its plain text—"[a] court has exclusive authority" to resolve that question.  Ex. B, SSA at § 11.D.

mention the concerns or interests of Steam subscribers or consider investigating the merit of their claims.

The slide deck also explained how Zaiger would find its target and legal theory.  *Id.* at Slide 6. The ideal target of this scheme is a company, like Valve, with consumer-favoring arbitration terms that uses the AAA as its arbitration provider.  *Id.*  To find a legal theory, Zaiger proposed a "passive supplemental approach," where it would simply look for motions to compel arbitrations from court dockets, then "copycat existing legal theories with potentially better advertising approach."  *Id.*

Notably, Valve and its existing antitrust litigation were the only specific targets and legal theories identified in the PowerPoint.  *Id.* at Slide 7.  Zaiger referenced the fact that Valve uses the AAA as its arbitration provider, that Valve will pay arbitration fees for good faith claims seeking less than $10,000, and Valve's successful motion to compel in the Western District of Washington, which allowed Zaiger to file a "copycat" theory here and save money.  *Id.*  Zaiger ultimately estimated that it could develop a case that, with Black Diamond's initial multi-million-dollar investment, would net a 1874% return.  *Id.* at Slide 9.

Zaiger has followed this blueprint here, copying the legal theories in the class action and signing up over 70,000 clients.  As it admits in these slides, the value of this case is in the volume of claims, not their merits.

And that may not be the worst of it.  Court records further reveal that Zaiger may have allowed Black Diamond to unethically control Zaiger's legal strategy.  According to a sworn affidavit filed by William Bucher—a former Zaiger employee now involved in two lawsuits against the company—Black Diamond made its funding contingent upon the firm agreeing to drop any arbitrations filed against Valve if Valve so much as paid the filing fees, noting that

proceeding further would be "fruitless."  Ex. D, Affidavit of William Bucher filed June 6, 2023, ¶¶ 31-37.  When Bucher raised ethics concerns about this ultimatum and sought alternative funding, Black Diamond demanded that Zaiger fire Bucher.  *Id.* ¶¶ 43, 47, 54-55.  Bucher contends that Zaiger's principal, Jeffrey Zaiger, reluctantly capitulated, admitting that Black Diamond was "responsible for all of his income" and managed $1.2 million of his personal savings with a "right to withhold that money if Zaiger stopped working for them."  *Id.* ¶¶ 47-51. Zaiger felt he had to do everything he could to keep Black Diamond, and was "too entangled" with Black Diamond to "act against Black Diamond's wishes" "even if he wanted to."  *Id.*  At least partially corroborating this story, Jeffrey Zaiger filed his own affidavit admitting that Black Diamond is one of the firm's largest clients and the owner of the building where his firm's offices sit.  Ex. E, Affidavit of Jeffrey H. Zaiger filed July 26, 2023 ¶¶ 25-26.  Zaiger also admits that Black Diamond pressured him to fire Bucher.  *Id*. ¶¶ 29-31.

Valve cannot know for sure whether Black Diamond funded these arbitrations and the process leading up to their filing.  If so, Bucher's and Zaiger's sworn testimonies suggest that Zaiger has violated multiple ethics rules that sharply limit the influence of third-party funders. *See* N.Y. R.P.C. 1.8(f) (third-party funding not permitted when it "interfere[s] with the lawyer's independent professional judgment or with the client-lawyer relationship"); N.Y. R.P.C. 5.4(c), (third-party funder cannot "render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services").[6]  At the very least, the slide deck and Bucher affidavit prove Zaiger planned to ignore the SSA's prohibition against collective and representative actions from the start.

---

[6]     Valve cites the New York Rules of Professional Conduct because both of the attorneys who work for Zaiger LLC are barred in that state.

All Zaiger cares about is its return on investment.  It certainly does not care about ensuring its clients abide by the SSA.  Zaiger created a collective action because that allows it to use the sheer volume of its clients' claims to attempt to extract a maximum settlement from Valve with minimal investment—even when that minimal investment compromises its client's interests.  Zaiger is not so much vindicating its clients' interests but using them to serve its own. And it filed this demand, and four other almost identical demands, in furtherance of its collective action: it hopes these five will be used as representatives to push for a global, collective resolution.

This demand, as an integral part of a broader, collective action, breaches the SSA by design.

> **B.     Zaiger Created and Implemented a Barebones Client-Onboarding Process with the Clear Intention of Luring and Signing Up as Many Clients as Possible *En Masse*, not to Pursue Individual Arbitrations.**

Zaiger's onboarding process proves it executed a scripted plan to pursue a collective action.  Specifically, it designed a hyper-efficient onboarding process that lures individuals to sign up by promising fast money without needing them to get involved.  Unsurprisingly, the process fails to adequately discuss or investigate its new clients' claims.  It is designed to create a 70,366-person collective action, not 70,366 (or any number of) individual actions.

The selling point to potential clients is the promise of money with minimal time or involvement.  Indeed, Zaiger paid for ads suggesting individuals could get "compensation offers without doing anything":

Steamclaims - Home | Steam Claims

Ad    https://www.steamclaims.com

Every case is different, but many consumers get compensation offers without doing anything

The onboarding screen describes Zaiger's claim against Valve in broad terms and tempts clients with the promise that they "could be entitled to hundreds or thousands" without having to pay anything "unless [they] get paid" first.



What Zaiger offers, in other words, is free money.

Zaiger's sign-up process repeatedly emphasizes both the ease of signing up and the lack of client involvement:

The client simply has to complete a two-minute form, sign a one-minute agreement, and Zaiger will "HANDLE THE REST."  That means that its new clients may get money "without doing anything beyond completing the initial form" like "many consumers" in their position. (Zaiger never identifies these "many consumers" or how Zaiger knows about them.)  "Handling

-12-

the rest" is inconsistent with the client's promise in the SSA to engage in informal dispute resolution and with Zaiger's duties under the Rules of Professional Conduct to "promptly inform the client of … material developments in the matter including settlement … offers," "reasonably consult with the client about the means by which the client's objectives are to be accomplished," and "keep the client reasonably informed about the status of the matter." *See* N.Y. R.P.C. 1.4(a)(1)(iii), (a)(2)(3).

Unsurprisingly, Zaiger omits the SSA's pre-arbitration requirements, as well as its prohibition of collective and representative actions, in these onboarding screens. Nor does Zaiger ever detail what arbitration is except to note that it may get folks their money faster. Zaiger highlights the fact that arbitration resolves "much quicker" than cases filed in court. That means Zaiger's potential clients will potentially get paid faster—as this "frequently asked question" notes:

**When can I expect to receive compensation?**
The legal process is hard to predict, but in general, cases in arbitration are resolved much quicker than cases filed in court. So, we expect to resolve your claim before the class action is resolved.

Zaiger's onboarding process is as efficient as advertised. The user merely fills out his or her name and address, then answers six basic (and suggestive) questions:



Notably, these questions do not establish that any potential client is actually "qualified" to bring an antitrust claim.  The only information it asks relating to the client's activity on Steam is the Steam Account Name.  It does not ask basic questions like (1) whether the individual even made a purchase on Steam, (2) if so, whether they purchased any non-Valve games or made in-game purchases; (3) how much they spent on these purchases; (4) the dates of their purchases; (5) whether the subscriber received or purchased a Steam key from a third-party; or (6) whether the individual purchased well-selling games (which are subject to reduced 25% or 20% revenue shares).  Without these details (and many others), Zaiger simply cannot know whether these individuals have standing or valid antitrust claims.  But Zaiger doesn't care.

Instead, the questions focus much more on reminding Zaiger's potential clients of the fact that they may get paid.  Zaiger asks how they want to be paid—by check or by Venmo—then asks, "what is the minimum amount you would be willing to settle your antitrust claim for?"  But Zaiger never clarifies what their claims are actually worth or explains the damages they could expect to receive.  Instead, Zaiger suggestively offers two pre-chosen amounts ($2,700 and

$900); "the total amount I've spent on Steam" (regardless of whether it would be recoverable); some "Other" amount; or—placed in the first position—whatever Zaiger "believe[s] is reasonably possible."

Zaiger then uses this paltry data to "check" if the user is qualified to bring a claim against Valve. Zaiger's onboarding email again emphasizes that this is a way for them to earn passive income. All they have to do is sign a form retainer agreement—which Zaiger highlighted can be "signed in one minute"—so "we can get started on your claim and obtaining compensation for you." Ex. F, Email dated May 3, 2023.

But if Zaiger's clients only take "one minute" to sign the form retainer agreement, they may miss critical terms in the six-page, 17-section contract. *See* Ex. G, Retainer. This includes the agreement that (contrary to Zaiger's branding), the client "may be required" to participate in discovery, sit for depositions, and attend a "hearing or trial." *Id.* at § 4. The agreement also includes a default agreement that Zaiger will receive 40% of the client's recovery, or the "option" to pay Zaiger's attorneys at a $1,150/hr. or $975/hr. hourly rate instead. *Id.* at § 2.

The agreement confers significant discretion to accept or reject settlement offers to Zaiger. Indeed, Zaiger states that it will not even tell its clients about "settlement offers that are de minimis, substantially below the average amount recovered for similarly situated plaintiffs, or for gift cards, discounts or other non-cash compensation." *Id.* at § 3. Zaiger then notes that if its clients want to accept non-cash settlements, they will have to compensate Zaiger for its services "on a per hour basis for the time spent on [their] case[s]" or forfeit that settlement to Zaiger. *Id.* Zaiger also requires its clients to allow the firm to end its representation solely because their claims are "unlikely to result in a recovery for any reason." *Id.* at § 6. It also includes an arbitration clause. *Id.* at § 12. By encouraging clients to review and sign in "one minute," the

-15-

only logical (and deeply troubling) inference is that Zaiger hopes its clients will simply gloss over all of these important terms.

The retainer is also significant in what it omits:  the "Clients Duties" section never mentions the SSA's requirement to engage in individualized informal dispute resolution before arbitration.  That, it seems, is part of what Zaiger means when it promises to "handle the rest." But participating in individualized pre-arbitration negotiations is required by the SSA, and is an integral and binding part of the dispute-resolution process for Valve and its subscribers.

In short, Zaiger's onboarding process does not require enough information or involvement from their clients to represent them individually.  Zaiger could never pursue individual claims on behalf of its 70,366 clients because it simply lacks the information necessary to do so.  Zaiger designed something akin to a virtual sign-up sheet because it wants to represent these 70,366 individuals *collectively*—not based on the actual existence or merits of any of those individual clients' claims, but instead based on the large number of clients that retained it.

### C.      Once Enough Clients Signed Up, Zaiger Reached Out to Valve , But Refused to Discuss Any of its Clients' Claims—Including Claimant's—Except on a Collective Basis.

Unsurprisingly, once Zaiger reached a critical mass of "clients," it proceeded to engage with Valve as representatives of a collective action.  Zaiger had no interest in discussing its clients' claims on an individual basis leading up to the filing of this and the four other arbitration demands against Valve.  Instead, it sent a single letter entitled, "Written Notice of Initiation of 30-day Good Faith Negotiation Period," claiming to write on behalf of 53,738 clients.  Ex. A, March 24 Correspondence at 1.  The letter spoke only in generalities about Valve's supposedly anticompetitive conduct.  *Id.*  It said almost nothing about Zaiger's 53,738 clients (including the

five that ultimately filed demands), like what any of Valve's subscribers wanted or the specific

basis for any of their purported claims or damages.

Instead, Zaiger treated Valve's subscribers like widgets:  attaching a spreadsheet of its

clients, listing their names and Zaiger-assigned ID numbers that are meaningless to Valve.

Zaiger eventually provided Steam Account Names (which subscribers create for their accounts)

and the state/country of their clients.  But Zaiger never provided the critical details needed to

establish the nature and basis of each Valve subscriber's specific antitrust claims.  Zaiger never

provided any details about the specific purchases at issue or how they were paid for.  Nor did

Zaiger ever identify what remedies any subscriber sought from Valve. That left Valve without

any ability to consider or address subscribers' alleged issues like the SSA requires.

Zaiger exacerbated the problem by modifying its client list by tens of thousands at a time.

In a May 18, 2023 letter, Zaiger notified Valve that it now represented an additional 16,526

clients, Ex. A, Correspondence 17.  Then, on August 8, 2023, Zaiger notified Valve that it

represented an additional 14,821 clients.  *Id*. at 21.  And, just days ago, Zaiger added yet another

2,690 clients to its list.  *Id.* at 48.

Adding to the confusion, Zaiger also noted in the May 18 letter that 13,242 of its original

clients were now represented by Bucher, who by then had formed his own law firm, Bucher Law

PLLC.  *Id*. at 17.  That was particularly troubling because Bucher and Zaiger were—and

remain—embroiled in two lawsuits over the circumstances surrounding Bucher's termination

and these clients.  *See Zaiger LLC v. Bucher Law PLLC*, Index No. 154124/2023 (New York);

*William W. Bucher IV v. Zaiger LLC*, Case 3:23-cv-00452-AWT (D. Conn).  In any case, not

including the most recent additions, Zaiger claims to represent 70,366 individuals.

-17-

Valve tried to work with Zaiger to correct these problems—consistently reminding it of its clients' obligations under the SSA, the inadequacy of its clients' notice, Valve's concerns over Zaiger's representation, *See* Ex. A, May 26 Correspondence at 18-20; Aug. 16 Correspondence at 33-34, and even offering to schedule meetings between its clients and Valve employees over Zoom, *Id*. Aug. 16 Correspondence at 34.  But Zaiger wanted none of it.  Over a series of letters, Zaiger re-buffed Valve's efforts to work with its clients individually.  Instead, Zaiger spoke only in generalities about its clients' claims, arguing it was Valve's job to figure out what each individual specifically wants and identify which of his or her purchases were part of his or her alleged antitrust claims because it "has this data." *Id.* Aug. 8 Correspondence at 22.  Zaiger also refused to engage in anything but collective negotiations before a mediator, *id*. Aug. 21 Correspondence at 35, and demanded that Valve sign a tolling agreement that would apply to all of its clients' claims, *id*. May 18 Correspondence at 17.  Zaiger also refused to provide any evidence of its (as opposed to Bucher's) representation except bare promises, calling statements about the Zaiger-Bucher disputes "irrelevant and a distraction."  *See, e.g.*, May 18 Correspondence at 17.

The five demands Zaiger filed with AAA are final proof of bad faith.  For one, Zaiger cannot plausibly argue that it was too onerous to talk about these five clients' issues beforehand.  As Valve pointed out, "This was an easily workable number and a perfect opportunity to make a good faith effort to resolve your clients' claims without the attendant costs of arbitration."  Ex. A, Sept. 6 Correspondence at 39.  But Zaiger never specifically mentioned or called out these individuals before—they were merely 5 of 70,366 entries in the spreadsheet Zaiger attached to its messages.

Moreover, the demands all provide the sort of details Valve kept asking for, like a rough estimate of how many purchases the individual subscribers made that were affected by the allegedly anticompetitive conduct (though even that is remarkably imprecise), and a specific value for damages that the claimants believe would provide adequate compensation for their injuries. That's exactly the kind of detail Valve asked for and the SSA requires. It's also the sort of thing Valve can't search for in its "data." Yet Zaiger refused to provide this crucial information before initiating arbitration.

In short, Zaiger's actions confirm it has no interest in ensuring its clients abide by the SSA. Quite the opposite.

## II. THE DEMAND ZAIGER FILED IS UNRIPE BECAUSE ZAIGER IS PREVENTING VALVE AND CLAIMANT FROM FOLLOWING THE INDIVIDUALIZED PRE-ARBITRATION PROCESS MANDATED BY THE SSA.

In addition to forbidding collective and representative actions, the SSA requires all subscribers and Valve to follow a simple pre-arbitration process before filing demands. That begins with proper notice of the individual dispute and follows with a "reasonable, good faith" effort to resolve it. The notice asks nothing more than what the AAA Consumer Rules require claimants to describe in their demands—which make clear that each claimant "must" "explain the dispute"; "specify the amount of money in dispute," and "[s]tate what the claimant [individually] wants." R-2. Simple pre-arbitration requirements like this are enforceable. *See Kemiron Atl., Inc. v. Aguakem Int'l, Inc.*, 290 F.3d 1287, 1291 (11th Cir. 2002) (holding that the arbitration provision in a commercial contract "ha[d] not been activated" because parties failed to request mediation first, a required "condition precedent").

Just like the arbitration requirement, this is an individualized, one-on-one process involving Valve and its subscriber. It serves a practical purpose. Individualized, informal discussions allow parties to get to the heart of a matter quickly and efficiently. No two

subscribers have identical purchase histories or experiences on Steam or will seek the same relief, and no two subscribers' approaches to informal resolution will be the same. That's why the SSA requires each subscriber to provide specific notice about the "nature and basis" of his or her claims as well as the individual relief he or she seeks.

The process is particularly useful here, where subscribers posit complex legal theories that depend on individual facts. For example, each of these subscriber's alleged antitrust claims turns on how many of the games the subscriber purchased were allegedly too expensive, what year they purchased those games (market conditions differ over time and because antitrust claims have a four-year statute of limitations), whether the games enjoyed heavy demand and received a discounted revenue share of 25% or 20% based on sales, whether the subscriber purchased the games at a discount during a sale, or whether they were not subject to a revenue share at all because the game was published by Valve or purchased via Steam keys. These are not trivial details. They are critical to the purported viability of any subscriber's claims and to Valve's defenses.[7]

The five demands Zaiger filed also help prove this point. No two demands are identical: Each one lists a unique amount for compensatory damages—varying from $750 to almost $6,000. And based on Valve's review of the claimants' accounts, each claimant's purchase history varies widely from the next in terms of the volume of purchase, dates of purchase, game titles (including Valve-published titles), and the frequency with which they acquired games through Steam keys. Accordingly, each of the variables listed above will have a unique impact on the alleged value of each claimant's dispute. More fundamentally, the purported value of

---

[7]     As stated in the Answer that Valve files concurrently with this brief, Valve denies all allegations of wrongdoing in Claimant's demand. As stated therein, Claimant's claims are meritless and worthless.

each claim also depends on which purchases are part of this arbitration—*i.e.*, the purchases each individual claimant believes were overcharged because of Valve's allegedly anticompetitive conduct.  Valve cannot discern that by looking at raw purchase history data, of course.

In other words, one-on-one conversations would have been tremendously helpful here. At the very least, Valve could have worked with its subscribers to figure out the true value of each claim.  But Zaiger refused to follow this process.  Instead, by pursuing a collective action, Zaiger rebuffed all attempts to describe in a notice or otherwise discuss their clients' individualized disputes on a good-faith basis.  Zaiger even rejected Valve's offer to sit down via Zoom and discuss issues with Zaiger's clients, resting instead on the same few paragraphs of generalities about Valve's conduct as an adequate clarification of its clients' claims.

As the foregoing section shows, Zaiger's refusal to engage in good-faith informal dispute resolution on behalf of each of his clients—as the SSA requires—was part of a premeditated plan to use the threat of AAA arbitration costs to force Valve to sign a lucrative omnibus settlement for itself and their lender.  Just as that plan (and its execution) led claimants to violate the SSA by pursuing representative and collective actions, it also prevented Zaiger from either properly noticing or properly discussing their clients' individual claims.

So this demand is inappropriate not only because it is, in reality, part of a collective action–it is also unripe because neither notice nor proper individualized negotiations as required by the SSA preceded it.  It should be dismissed on this basis too.

## III.   THE DEMANDS SEEK INJUNCTIVE RELIEF THAT GOES WELL BEYOND WHAT THE SSA ALLOWS

Even if the AAA allows these demands to proceed, they must be narrowed.  Specifically, all five demands seek an injunction that would have widespread impact on Valve's business with its customers.  They all ask the arbitrator to "[i]ssue a permanent injunction pursuant to 15

U.S.C. § 26 and the Washington Consumer Protection Act, preventing Valve from enforcing its PMFNs and other anticompetitive and unlawful acts[.]"  Under the SSA, claimants are not entitled to ask for such injunctive relief, and arbitrators are not allowed to provide such injunctive relief.

The point need not be belabored.  The SSA makes clear that this arbitration is strictly between Valve and the individual claimant.  He or she cannot participate in any "CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE." § 11.D.  The remedy must likewise be individualized. The SSA states, in all caps, "THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM."  *Id.*  A permanent injunction that would force a drastic change in Valve's business with 120 million active users plainly exceeds that.

Zaiger presumably included this obviously improper request for injunctive relief to obtain more leverage over Valve, to drive its desired collective settlement.  It should be struck.

## IV.   BECAUSE ZAIGER HAS NOT FILED ADEQUATE DEMANDS, ZAIGER MUST REIMBURSE VALVE'S FILING AND ATTORNEYS' FEES.

The only question that remains is whether Valve should still be stuck with the bill for its filing fee in response to Zaiger's facially insufficient demands.  The answer is no.  Valve requests that Zaiger reimburse those filing fees, as well as Valve's attorneys' fees incurred for responding to the demands.

Both the SSA and Consumer Rules allow for such reimbursement.  The SSA states that Valve will not seek attorneys' fees or costs for arbitration—except if an "arbitrator determines your claims are frivolous or were filed for harassment."  Section 11.C.  This mirrors the Consumer Rules' standards.  Specifically, "The arbitrator may also allocate compensation,

expenses as defined in sections (v) and (vii) of the Costs of Arbitration section, and administrative fees (which include Filing and Hearing Fees) to any party upon the arbitrator's determination that the party's claim or counterclaim was filed for purposes of harassment or is patently frivolous." R-44(c). Courts defer to arbitrators when they impose such sanctions. *See First Pres. Cap., Inc. v. Smith Barney, Harris Upham & Co.*, 939 F. Supp. 1559 (S.D. Fla. 1996) (confirming award that dismissed case based on "abhorrent behavior" during discovery).

Zaiger's conduct meets both standards. Zaiger has systematically and intentionally ignored the SSA's core requirements. Despite its clear prohibition on collective actions and requirements for individualized pre-arbitration dispute resolution, Zaiger signed up their clients collectively, refused to negotiate with Valve regarding their claims except collectively, and now filed five representative demands without properly following the SSA's procedures.

Because Zaiger filed this arbitration and four others without caring to ensure that its clients followed the SSA's requirements, those clients have now violated the SSA, and Valve must now pay filing fees for no reason. Zaiger's efforts are frivolous and intended to harass. Zaiger or its clients must reimburse Valve for the filing fees it has had to pay even to get to this preliminary stage, plus Valve's attorney's fees.[8]

## V.     CONCLUSION

Valve fully acknowledges that its subscribers have the right to arbitrate their disputes. Nor does Valve want to back out of using the AAA as its arbitration provider. Valve stands ready to discuss, and arbitrate if necessary, any individual dispute with any customer, █ included. But not as part of a collective scheme like the one being run by Zaiger. Such

---

[8]     Valve is not taking Zaiger's abusive practices laying down. On October 20, 2023, it filed a lawsuit against Zaiger in Washington state court for tortious interference and abuse of process *Valve Corp. v. Zaiger, LLC*, Case No. 23-2-20436-1.

collective and representative actions are forbidden by the SSA, which also requires customers to each engage in a good faith dialogue with Valve about their individual issues before filing arbitration demands.  All Valve wants to do is enforce these terms, in the face of Zaiger's unethical and harassing tactics.  It therefore requests that this demand be dismissed.

Date: October 24, 2023

*/s/ John G. Papianou*

**MONTGOMERY McCRACKEN**
  **WALKER & RHOADS LLP**
John G. Papianou
Robert E. Day
1735 Market Street
Philadelphia, PA 19103
(215) 772-1500
jpapianou@mmwr.com
rday@mmwr.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October, 2023, I caused a true and correct copy of Respondent's Motion to Dismiss for Lack of AAA Jurisdiction, To Strike Request for Injunctive Relief, and For Reimbursement of Costs to be served by email on Claimant through his counsel of record and on AAA Administrator Janelle Manuel.

*/s/ John G. Papianou*
John G. Papianou

*Counsel for Valve Corporation*

-25-